MISSOURI, K. & T. RY. CO. OF TEXAS v. HURDLE et al.

(Court of Civil Appeals of Texas. Dallas. Dec. 9, 1911. Rehearing Denied Jan. 20, 1912.)

1. RAILROADS (§ 350*)—CROSSING ACCIDENT—NEGLIGENCE — WATCHMAN — QUESTION FOR JURY.

In an action for death at a railroad crossing, whether the crossing was so dangerous as to require the railroad company, in the exercise of ordinary care, to station a flagman or watchman there, *held* for the jury.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 350.*]

2. RAILROADS (§ 307*)—CROSSINGS—DUTY TO STATION WATCHMEN.

In order to raise an issue whether a railroad was negligent in failing to station a watchman at a public crossing at which a traveler was killed, it was not necessary to show that persons about to use the crossing were prevented from discovering the approach of trains by permanent obstructions, it being sufficient that the location of the crossing and the conditions surrounding it, together with the switching of cars and the operation of defendant's trains, rendered the crossing unusually hazardous.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 972–977; Dec. Dig. § 307.*]

3. RAILROADS (§ 351*)—CROSSING ACCIDENT—DISCOVERED PERIL—INSTRUCTIONS.

Where, in an action for death at a railroad crossing, the evidence was sufficient to authorize submission of the issue of discovered peril, an instruction that if the engineer saw decedent and discovered her peril in time to have avoided striking her by the use of all means at hand to stop the locomotive, but failed to use all such means, such failure, if any, would be negligence, and if it directly and proximately caused decedent's death, it would render defendant liable, although decedent may have been negligent, was not erroneous, as imposing a greater burden on defendant than the law required in requiring the use of all means at hand to stop the locomotive, as it required no greater duty than what was obviously necessary under the particular facts of the case.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 351.*]

4. APPEAL AND ERROR (§ 719*)—ASSIGNMENTS OF ERROR—NECESSITY.

An instruction to the giving of which no error is assigned cannot be considered on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2968–2982; Dec. Dig. § 719.*]

5. DEATH (§ 104*)—MEASURE OF DAMAGES—INSTRUCTIONS—PECUNIARY BENEFITS.

In an action for death, an instruction authorizing recovery, in case the jury found for plaintiffs, of such sum as, if immediately paid, would be a fair compensation to plaintiffs for the loss of pecuniary benefits sustained by them by decedent's death, was not erroneous in so far as it further defined pecuniary benefits to mean, not only money, but such loss as the evidence showed plaintiffs had suffered directly and proximately from decedent's death, and which should be valued in money, including in the case of plaintiff's minor children, the reasonable pecuniary value of nurture, care, and education, which they would receive from their deceased parent during their minority, had she lived, as being an unnecessary explanation and tending to induce the jury to believe that injured persons were entitled to compensation for any kind of injuries, or to believe that pecuniary benefits for which plaintiffs were entitled to recover included benefits other than money benefits.

[Ed. Note.—For other cases, see Death, Dec. Dig. § 104.*]

6. TRIAL (§ 255*)—REQUEST TO CHARGE—NECESSITY.

If defendant, in an action for death of a wife and mother, desired a charge, limiting plaintiffs' recovery to the pecuniary loss which the husband sustained, to be ascertained by deducting the cost of maintaining the wife from the value of her services, he should have requested such charge.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 627–641; Dec. Dig. § 255.*]

7. APPEAL AND ERROR (§ 525*)—RECORD—INSTRUCTIONS—REFUSAL—SIGNING BY TRIAL JUDGE.

Refusal of an instruction cannot be reviewed on appeal, where the notation of refusal is not signed by the presiding judge, as required by Rev. St. 1895, art. 1320.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2376–2379; Dec. Dig. § 525.*]

8. APPEAL AND ERROR (§ 827*)—SUBMISSION—VACATION—AMENDMENT OF RECORD.

Under the express provisions of Courts of Civil Appeals Rule 22, as amended March 15, 1911 (142 S. W. xii), a submission of an appeal will not be set aside in order to permit appellant to have the record amended, so as to show that a special charge requested was in fact refused.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 827.*]

9. EVIDENCE (§ 49*) — JUDICIAL NOTICE — HANDWRITING OF TRIAL JUDGE.

Where the Court of Civil Appeals was not familiar with the handwriting of the trial judge, it could not take judicial notice that the word "refused," written on a request to charge, was written by the trial judge.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 71; Dec. Dig. § 49.*]

10. TRIAL (§ 269*)—REQUEST TO CHARGE—REFUSAL—IDENTIFICATION.

The writing of the word "refused," on a request to charge by the trial judge, is insufficient to certify the refusal thereof, under Rev. St. 1895, art. 1320, providing that the presiding judge, when he refused a request, shall note distinctly such refusal, and shall subscribe his name thereto.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 676; Dec. Dig. § 269.*]

11. TRIAL (§ 260*)—REQUEST TO CHARGE—INSTRUCTIONS GIVEN.

It is not error to refuse a requested charge substantially covered by instructions given.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

**12. APPEAL AND ERROR (§ 1005*)—REVIEW—VERDICT—EVIDENCE.**

A judgment will not be reversed on appeal because the verdict is not supported by the evidence or is against the evidence, where the case was properly submitted to the jury, and there is any evidence in the record which, if true, would support the verdict which has been approved by the trial court, it not appearing that the jury was influenced by passion or prejudice.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3948–3954; Dec. Dig. § 1005.*]

**13. TRIAL (§ 133*)—MISCONDUCT OF COUNSEL—IMPROPER ARGUMENT—ACTION OF COURT.**

Where the court instructed the jury not to consider improper remarks of plaintiff's counsel as to the amount of the verdict they should allow, but that the court would instruct them as to the law, counsel's statement will be regarded as without prejudice.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 316; Dec. Dig. § 133.*]

Appeal from District Court, Wood County; R. W. Simpson, Judge.

Action by George D. Hurdle and others against the Missouri, Kansas & Texas Railway Company of Texas. From a judgment for plaintiffs, defendant appeals. Affirmed.

Alex. S. Coke and Dinsmore, McMahan & Dinsmore, for appellant. M. D. Carlock and Johnson & Edwards, for appellees.

BOOKHOUT, J. George D. Hurdle in his own behalf and as next friend for his minor daughters, Bernice Hurdle and Edith Hurdle, filed this suit in the district court of Wood county on September 12, 1910. In the petition it is averred that Mrs. Tessa Hurdle, the wife of George D. Hurdle and the mother of the two minor plaintiffs, lost her life at Winnsboro, Tex., on the 21st day of March, 1910, by reason of being struck and run over by a locomotive of appellant at the crossing of Walnut street over appellant's tracks; that Walnut street was one of the principal streets of Winnsboro, an incorporation town, and was much used by the public. The petition proceeded in considerable detail to set out the facts, wherein it was alleged defendant was negligent. The appellant answered by general denial and by pleas of contributory negligence, and set out certain particulars wherein it was alleged Mrs. Hurdle was guilty of contributory negligence.

Appellees filed a first supplemental petition which, in addition to the general denial of the appellant's answer, alleged that Mrs. Hurdle while passing over the crossing was put in great peril by the negligence of the appellant, and that the peril was so imminent as to relieve her from a charge of contributory negligence in jumping from the buggy.

The case was tried at the November term, 1910, of the court, with the aid of the jury, and the trial resulted in a verdict and judgment for the appellees in the sum of $15,000, apportioned equally. Appellant filed original and amended motions for a new trial, which motions were denied by the court, and the appellant excepted and perfected this appeal.

The first assignment is that the court erred in the sixth paragraph of its charge to the jury submitting to the jury a question of negligence of the defendant in failing to keep a flagman or watchman at the street crossing over the railroad at Winnsboro where Mrs. Hurdle lost her life, based on a finding submitted as to whether the said crossing was extraordinarily hazardous or dangerous.

[1] The first proposition presented is that there was no evidence sufficient to support a finding by the jury that the conditions existing at the Walnut street crossing over the railroad made the crossing dangerous to travelers to such degree as demanded of the appellant to station a flagman or a watchman at the crossing; and therefore it was error to submit that issue.

Two other propositions are presented under this assignment, but their substance is embraced in the proposition above set out. These propositions are not sustained.

The town of Winnsboro contains about 3,500 inhabitants. The tracks of appellant are located near the center of the town, right at the business district, and divide the residence portion in about equal parts. Appellant's tracks pass through Winnsboro, east and west, and divide the population of the town about equally, but leaving the business houses north of the railroad. Main street, the principal street of the town, on which are many of the business houses, runs north and south, and is 70 feet wide. Walnut street is 60 feet wide, and is the next street east of Main street, and from the center of Main street to the center of Walnut street, measured on the railroad, is 655 feet. Main street and Walnut street are the principal streets of the town which run north and south, and both are commonly used by the public. Both these streets cross the railway tracks at grade. From some point west of Main street to a point east of Walnut street there are four railway tracks. The most northern track is called the "house track," the track next south of the house track is the "main line," the track next south of the main line is the "passing track," and the track south of the passing track is called the "storage track." All these tracks cross Main and Walnut streets, and are parallel, except that the house track bears away from the main track sufficiently to leave the station buildings and the express office between them. At Walnut street the distance between the center of the storage track to the center of the passing track is 14 feet, and the distance from the north rail of the storage track to the south rail of the passing track is 9 feet and 4 inches, and the distances between the passing track and the main line are the same. But the distance between the main line and the

house track, which is north of the main line, is not quite so great, because the house track at that point curves in towards the main line and connects with the main line a few feet east of Walnut street. At Walnut street the main line, the passing track, and the storage track are parallel. At the crossing of Walnut street over the railroad there are crossing planks laid, which planks are about 30 feet long. From the east edge of these crossing planks to the head block of the switch stand east of Walnut street is 90 feet, and this switch stand is 315 feet east of the appellant's station house. At the Walnut street crossing a telegraph pole stands 22 feet south of the southern railway track and on the east side of Walnut street. The switch yard was within a comparatively small compass and was crossed by two streets, Walnut and Main. Appellant's depot, shipping shed and platform, scales and other objects, besides an oilhouse and two large tanks resting on high and wide pillars, were situated near the tracks and between Main and Walnut streets.

Will Beggs, the joint agent of appellant and the Marshall & East Texas Railway at Winnsboro, testified substantially as follows: When Mrs. Hurdle was killed, and for a long time prior thereto, there were usually three passenger trains, and from two to four freight trains standing, moving, and switching on defendant's tracks at Winnsboro every day from about noon until about 2 o'clock p. m. The Marshall & East Texas passenger train was due at Winnsboro at 11:50 a. m., coming in on defendant's tracks at the east end of the yard and over the crossing where Mrs. Hurdle was killed. After the passengers would get off, that train usually went down on the passing track, either heading into that track on the cutoff track or backing down the main line and coming into the passing track at the east end; in this latter event it had to pass over said crossing. That train left Winnsboro at 1:25 p. m. every day. In getting on the main track to leave Winnsboro this train either used the cut-off track or went down the passing track and passed over the Walnut street crossing. While this train was in town it moved and stood, after its arrival and before getting ready to leave, on the passing track over or near that crossing. The west-bound passenger train of defendant, coming in over that crossing, arrived there at 1:00 p. m. and left at 1:25 p. m. every day. The east-bound passenger train of defendant arrived at 12:20 p. m. and left at 1:05 p. m. every day, passing over said crossing in leaving town, as, also, did the Marshall & East Texas passenger train. The way defendant's east and west bound passenger trains passed each other at Winnsboro was that they "sawed by" each other on the cut-off track, the passing track, and the main track. Besides the passenger trains there were usually from two to four freight

trains there every day between the noon hour and 2 o'clock p. m. There were an east-bound and a west-bound local freight train, and sometimes extra freight trains in there between those hours. No through freights were due there between those hours, but they sometimes got in there about that time. The through trains frequently did what we call "through" switching at Winnsboro, and the local trains did what we call "station" switching there. When any cars were to be spotted or rearranged in the yard after these trains had done their switching, the west-bound local generally did that. In doing their switching these trains generally had occasion to pass over the Walnut street crossing. They pulled cars in and out on the tracks there and passed over the crossing in doing so. All of these trains passed over that crossing in entering or leaving town, and the freight trains generally did a good deal of switching in the yard there, passing back and forth over the crossing. An oil mill, a lumber mill, and an electric light plant were situated in the eastern part of the town, and tracks going out to these plants left defendant's main line about 300 feet east of Walnut street crossing. The freight trains frequently had occasion to set out cars on these tracks, and in doing this switching they had to pass over that crossing. It is true that from about noon until about 2 o'clock in the afternoon, at the time of Mrs. Hurdle's death and prior thereto, there was a great deal of use made of the Walnut street crossing by defendant's engines and cars moving backward and forward over it in coming in and going out of town and in switching and passing each other at that station.

Will Butler testified substantially as follows: Winnsboro was an incorporated town with a population of about 3,500. The railroad of appellant ran in an east and west course through about the center of the town, dividing the residence portion of the town about equally. Most all of the business houses in the town were on the north side of the tracks. Witness, riding horseback, was crossing the tracks just in rear of Mrs. Hurdle's buggy at the time she was killed. This accident occurred where the tracks crossed Walnut street, a public crossing within the corporate limits of the town; it was the first crossing east of appellant's depot. Mrs. Hurdle lived on the south side of the railway, 200 yards or more southeast from the crossing. There was only one public school building in Winnsboro for white people, and it was situated on Walnut street directly north of the railway crossing. This Walnut street crossing was generally used by the people who lived in the southeastern part of town when they were going to the business district or to the north side of the railroad. Besides being a public street of Winnsboro, Walnut street was also a public road, leading out in the country and to

the town of Gilmer. The crossing of this street over the tracks was surfaced and prepared for vehicles over a space about 20 feet wide and on a level with the tracks. That crossing was used constantly by people living in that part of town and by people who traveled that road leading out in the country. The people residing in the town and community using that crossing in coming to and returning from the business district numbered, witness supposed, about 300; possibly more. The school children residing in the part of town where Mrs. Hurdle lived usually crossed the tracks at the Walnut street crossing in going to and from school. Mrs. Hurdle was killed about 1:30 or 1:45 o'clock in the afternoon, at which time I was present on horseback. When I rode up Mrs. Hurdle was waiting in her buggy there at the crossing for the purpose of driving over the tracks toward the north. The crossing was blocked by a tolerably long freight train headed east and standing on the second track from the south, the passing track. The engine was three or four car lengths east of the crossing, and the cars of the train blocked the crossing. The freight train backed west until the engine was west of the crossing, and Mrs. Hurdle then started over the crossing, driving along in a walk, and I started over pretty close behind her buggy. At that time I did not see any other engine or train either standing or moving. When I first rode up to the crossing, I saw an engine over in the west yard and another one up at the station. Both of them were standing still when Mrs. Hurdle started over the tracks. I did not observe any engine or cars approaching the crossing from any direction. When Mrs. Hurdle was about on the main line I saw an engine and caboose on the main track coming toward the crossing from the west, and moving tolerably fast. Before this engine and caboose came in sight Mrs. Hurdle's view of them was obstructed by the freight train. I am not sure whether the freight train had stopped or whether it was still backing just before the engine and caboose came in sight. The tracks were a little upgrade toward the west, and I think the freight engine was using steam in backing the train. The first notice I had of any alarm was when I saw Mrs. Hurdle lean forward and urge the horse with the lines. After she urged the horse just an instant she jumped out of the buggy on the west side and hit the ground just north of the main track. The motion of the buggy or something threw her, and she fell backward and around with her head or shoulders on the north rail of the track. In an instant the engine was on her and killed her. At the time of Mrs. Hurdle's death defendant's east-bound passenger train arrived at Winnsboro about 12:45 o'clock p. m., and its west-bound passenger train arrived there about 1:05 o'clock p. m., and the Marshall & East Texas Railway had a passenger train in there every day at or about the same time. All of these trains used and passed each other on defendant's tracks at and near the crossing where Mrs. Hurdle was killed; and very often there were two or three freight trains there about the same time, which passed the passenger trains and each other on these tracks. They have been doing that way ever since I have been in Winnsboro, for about 12 years. I never saw the locomotive that killed Mrs. Hurdle until just an instant before she leaped from the buggy. The ground on the south side of the crossing where she was killed was lower than the ground upon the track.

George D. Hurdle testified substantially as follows: Mrs. Tessa Hurdle was my wife and the mother of my two daughters. Our home was south of defendant's railroad and about two blocks southeast of the Walnut street crossing where the accident occurred. That place is and was within the corporate limits of Winnsboro. Defendant's railway, running east and west, divides the residence portion of the town about equally. I think there are 400 or 500 people who lived in the part of town where we lived, and who generally used the Walnut street crossing, as my family did. This crossing was used by the public who traveled the two main roads that led into that crossing from the country, as well as by the people who lived in town. One of these roads is the Gilmer road, and the other is called the Stout road. The Stout road runs south and the Gilmer road runs east on the south side of the railroad. The business houses in Winnsboro were north of the railroad and about two blocks west of Walnut street crossing. When going in a vehicle home from my place of business I generally cross the railroad at Walnut street, and my wife in passing between our home and the business part of town generally used the same crossing. The school building of the town was situated on Walnut street north of the railway, and my children usually crossed the railroad at Walnut street in going to and from school. Four railway tracks crossed over Walnut street. On the north side of the tracks and west of the street there were an oilhouse and two oil tanks. The oil tanks are right close up to the west edge of the street. These two tanks are about 30 feet long, and stand about 10 feet from the ground on three large brick pillars. They are iron tanks lying horizontally on the brick piers and extending north and south. The oilhouse is right by the side of the tanks—west of them. The most southern track at this crossing was the storage track, and was used for storing cars not in use; the next track toward the north was the passing track, which connects with the main line at both ends, its eastern connection being just east of the Walnut street crossing. The next track toward the north was the main line. The

next track was the house track, which ran on the north side of the station and along by the shipping shed and the cotton platform. At and before the time of the accident the defendant had two passenger trains, and the Marshall & East Texas Railway had one passenger train, at Winnsboro about the middle of every day. Usually there were also one or two freight trains in Winnsboro about the same time when these passenger trains were there every day. All of these trains stood on and passed over defendant's tracks and the crossing where my wife was killed. Defendant's east-bound train usually took the side track, the passing track, west of the express office, which was west of the depot. When defendant's west-bound passenger train came in it generally remained on some track near the station. I believe the east-bound train left first. The Marshall & East Texas passenger train usually stood near the Walnut street crossing, while defendant's passenger trains were at Winnsboro. While these passenger trains and the freight trains were in defendant's yards, about the middle of every day, there was usually a good deal of switching going on in the yards. The trains went up and down the tracks and over the Walnut street crossing a right smart. Most of the time there were cars stored and standing on the storage track, and most of them usually stood west of the Walnut street crossing. The direction of travel from my house to Walnut street crossing was and is northwest; a telephone pole stands about the east edge of Walnut street near the tracks, and you would have to turn around that pole to reach the crossing. At the crossing the tracks are higher than the surface of the ground near the crossing, from one to two feet higher. From Walnut street west to the station it is a little upgrade. Planks are laid over the Walnut street crossing, between the rails, about 20 feet wide. ˅ The passenger station is a little east of the main street crossing and lies between the main track and the house track. This building must be about 80 feet long and 35 or 40 feet wide. East of the passenger station there was a toolhouse and a closet. The shipping shed was north of that point and north of the house track. Down east of the station, near the tracks, were some wagon scales with a little house over them. There were a good many big trees between my house and the Walnut street crossing which partially obstructed the view of one standing in front of my house and looking northwest toward the railway, but one could move around and see the station.

[2] In order to raise the issue, whether the railway company is guilty of negligence in failing to station a watchman at a public crossing, it is not necessary to show that persons about to use the crossing are prevented from discovering the approach of trains by permanent obstructions, as appellant seems to contend. If the location of the crossing and the conditions surrounding it, together with the switching of cars and the operation of its trains by the company rendered the same unusually hazardous, then it was a question of fact for the determination of the jury, whether the company in the exercise of reasonable care should have stationed a watchman at the crossing.

The population of Winnsboro; the location of the railway in the town; the ·number of tracks which crossed Walnut street, and the purposes for which they were commonly used; the proximity of the crossing to the switches; the situation of objects near the tracks which to some extent obstructed the view; the location and importance of the crossing with reference to the residences, business district, and schools of the town; the large number of men, women, and children who commonly used the Walnut street crossing, and the frequency of their using it, especially about the time of day when this accident occurred; the number of trains, locomotives and cars which, every day about that time and at other times, stood and were operated on these tracks near this crossing and over it; the movements which these locomotives and cars had to make on these tracks, near and over the crossing, to do the switching and avoid each other; the probability, illustrated by the circumstances in which Mrs. Hurdle was killed, that one or more of these trains, standing or moving, would prevent a person about to use the crossing from discovering the approach of another locomotive or train intending to pass over the crossing at the same time—authorized the court to submit the issues, whether the operation of appellant's locomotives and cars across Walnut street imposed extraordinary hazards upon persons traveling the street at that place and whether ordinary care to avoid injuring such persons required appellant to station a watchman at the crossing. Railway Co. v. Magee, 92 Tex. 616, 50 S. W. 1013; Railway Co. v. Bratcher, 54 Tex. Civ. App. 10, 118 S. W. 1091; Railway Co. v. Moore, 107 S. W. 658; Railway Co. v. Gibson, 83 S. W. 862; Railway Co. v. Jones, 60 S. W. 978; Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L.. Ed. 489, 490; Railway Co. v. Jones, 95 Fed. 374, 37 C. C. A. 160; Annacker v. Railway Co., 81 Iowa, 267, 47 N. W. 69; Railway Co. v. Schneider, 45 Ohio St. 678, 17 N. E. 326.

The charge as given was correct and not subject to the criticisms made in the fourth and fifth propositions under this assignment.

[3] Error is assigned to the seventh paragraph of the charge submitting the issue of discovered peril, reading as follows: "If you find the engineer in charge of the locomotive that injured Mrs. Hurdle saw her and discovered her peril, if any, of being struck by his locomotive, in time to have avoided striking her, by the use of all the means at hand to stop the locomotive, then

if you further find that the engineer failed to use all the means at hand to stop the locomotive after he saw the peril, if any, of Mrs. Hurdle being struck by it, such failure, if any, would be negligence and if such failure, if any, directly and proximately caused injury and death to Mrs. Hurdle, it would render the defendant liable, although deceased may have been guilty of contributory negligence." It is insisted that the evidence was not sufficient to raise the issue, and for this reason the court erred in submitting the same to the jury. This contention is not sustained. After a careful examination of the testimony, we are of the opinion the evidence was amply sufficient to raise the issue. Again, it is contended that the charge quoted is erroneous in that by using the words, "in time to have avoided striking her, by the use of all the means at hand to stop the locomotive," it imposed a greater burden on appellant than the law required. It is true that ordinary care is the measure of an engineer's duty to avoid inflicting injury or death upon a person discovered by him in, or about to go into, a position of peril in front of a moving locomotive, still humanity and the law require that in such circumstances he "use all the means at hand" to stop the locomotive and avoid the impending injury. The giving of this charge does not constitute reversible error, in view of the fact that it exacts no greater duty from appellant than the doing of that which obviously was necessary under the particular facts of the case. Railway Co. v. Hodges, 102 Tex. 524, 120 S. W. 848; s. c., 54 Tex. Civ. App. 364, 118 S. W. 767; Railway Co. v. Magee, supra; Railway Co. v. Lankford, 88 Tex. 499, 31 S. W. 355; Railway Co. v. Reynolds, 136 S. W. 279; Railway Co. v. Crawford, 54 Tex. Civ. App. 196, 117 S. W. 193; Railway Co. v. Stone, 23 Tex. Civ. App. 106, 56 S. W. 933; Railway Co. v. Sein, 11 Tex. Civ. App. 386, 33 S. W. 558; Railway Co. v. Bishop, 37 S. W. 764. Nor was it error in the court in modifying certain charges on contributory negligence asked by appellant, in telling the jury that such negligence would be no defense in the event the jury found the issue of discovered peril in plaintiff's favor.

These remarks also dispose of the sixth assignment of error adversely to appellant, and the same is overruled.

[4] It is assigned that the court erred in charging the jury as follows: "You are instructed that it is the duty of the employés of a railway company operating its trains, to use ordinary care to keep a lookout to discover and avoid injuring persons who may be crossing, or about to cross, its tracks at a public street crossing; the degree of care varying as the known probabilities of danger may vary at the different crossings along its line of road; and the failure to use such care by its employés is negligence on the part of such company, for which it is liable in damages for an injury resulting directly and proximately from such negligence, unless such liability is defeated by the contributory negligence on the part of the persons injured." There is no assignment of error complaining of this charge and the giving of the same does not, as claimed by appellant, constitute fundamental error.

[5] Appellant assigns error to the thirteenth paragraph of the court's charge on the measure of damages as follows: "If, from the evidence, you find for plaintiffs, and you award them damages, then in fixing the amount of your verdict you will allaw the plaintiff, George D. Hurdle, husband, and Bernice Hurdle and Edith Hurdle, minor children of deceased, such sum of money, if paid now, as will be a fair compensation to them for the loss of pecuniary benefits sustained by them in the death of Mrs. Tessa Hurdle (and by 'pecuniary benefits' is meant not only money, but such loss as the evidence shows that the plaintiffs have suffered, directly and proximately, from the death of Mrs. Tessa Hurdle, and which can be valued in money, and in case of minor children includes the reasonably pecuniary value of nurture, care and education which they would have received from their deceased parent during their minority had she lived); and you will separate or apportion in your verdict the sum, if any, which you will allow George D. Hurdle, the surviving husband, and the sums, if any, which you allow to each of the minor children, Bernice Hurdle and Edith Hurdle. You cannot allow plaintiffs anything by way of consolation for the death of Mrs. Tessa Hurdle, or for any sorrow, anguish or grief suffered by them as the result of her death, or for the loss of the society, affection or companionship of deceased, and you will exclude all such consideration from your verdict." It is claimed that this charge in using the words "by 'pecuniary benefits' is meant not only money, but such loss as the evidence shows that the plaintiffs have suffered directly and proximately from the death of Mrs. Tessa Hurdle and which can be valued in money, and in the case of minor children includes the reasonably pecuniary value of nurture, care and education which they would have received from their deceased parent during their minority, had she lived," is erroneous because the said explanation was unnecessary, and tended to induce the jury to believe that the injured persons are entitled to compensation for any kind of injuries; and, second, because the said explanation or definition is misleading, in that it is confusing and tended to induce the jury to believe that pecuniary benefits for which plaintiffs were entitled to recover included some benefits besides moneyed benefits, and that the jury was authorized to award damages for any loss which the juror might in his own mind measure in money. These criticisms are not

sustained. This paragraph of the charge contains no misstatement of law. It was proper to give the definition complained of in order to aid the understanding of the jury as to the character and scope of the loss sustained by plaintiffs which should be considered in deciding upon the amount of a verdict in their favor. Railway Co. v. McVey, 99 Tex. 31, 87 S. W. 328; Railway Co. v. Davenport, 102 Tex. 369, 117 S. W. 790; s. c., 110 S. W. 150; Railway Co. v. Younger, 90 Tex. 387, 38 S. W. 1121; Railway Co. v. Wallace, 53 Tex. Civ. App. 127, 115 S. W. 303; Railway Co. v. Rutland, 45 Tex. Civ. App. 621, 101 S. W. 529; Gray v. Phillips, 117 S. W. 870; Railway Co. v. Williams, 117 S. W. 1043, affirmed (Sup.) 125 S. W. 881; Railway Co. v. White, 120 S. W. 959, affirmed (Sup.) 131 S. W. 811.

[6] If appellant desired a charge limiting a recovery by plaintiffs to the pecuniary loss which the husband sustained, in determining which the cost of maintaining the wife should be deducted from the value of the services she would have rendered, it should have presented a special charge to that effect.

The eighth assignment is that the court erred in refusing to give to the jury the defendant's special charge No. 5, which was upon the measure of damages, and which is in these words: "If you should find for the plaintiffs under other instructions given you, then, on the question of damages, you are instructed that plaintiffs' right of recovery is limited to the pecuniary or money value of the life of Mrs. Hurdle to them; that is to say, Mr. George D. Hurdle would be entitled to recover for the pecuniary or money value of the services of his wife to him, less the reasonable cost of maintaining her, and the children would be entitled to recover the pecuniary or money value of the services of Mrs. Hurdle to them." The record recites the charge, and states that the same was requested by defendant's attorneys, and their names are signed to the request.

[7] The request states that after the court's charge was read to the jury the above special charge was requested, and the same was by the court refused. The refusal is not signed by the presiding judge. In this condition of the record we are not authorized to consider this assignment. R. S. art. 1320.

After the cause had been submitted and taken under advisement by this court, the appellant filed a motion asking that the submission be set aside and for time to amend the record in the trial court, so as to show that special charge No. 5 was in fact refused. Attached to the motion is what is claimed the original special charge. This request must be refused in view of rule 22 (142 S. W. xii) for the preparation of cases for submission in this court as amended by the Supreme Court, March 15, 1911. H. & T. C. Ry. Co. v. Parker (Sup.) 135 S. W. 369; Collins & Jordan v. Kittrell, 140 S. W. 814, opinion by this court on rehearing,

filed November 11, 1911, not yet officially published. Under this rule, as amended, this court is not permitted to set aside the submission of a case for the purpose of showing an omission in the record and correcting such omission. What is styled the original charge in the motion was marked filed in the trial court, and appellant insists that the same should be considered by this court in connection with the record as showing that the same was in fact refused by the presiding judge. The only difference between the record and the original charge attached to the motion is that the original charge is all in typewriting except the word "refused," at its close, which was written with a pen. Appellant contends that, as the trial judge was the only person authorized to write this word at the place it was written, we should construe the same as having been written by him.

[8] We are not familiar with the handwriting of the trial judge, and cannot take official notice that the word "refused" is in his handwriting. The record fails to show affirmatively that the word "refused" is in his handwriting.

[9] Again, we cannot construe the charge as having been refused in view of article 1320 of the Revised Statutes. This article expressly states that the presiding judge, when he refuses a requested charge, shall note distinctly such refusal, "and shall subscribe his name thereto." This was not done, and we cannot construe the charge as having been refused by him. However, if we are in error in this holding, and the charge should be considered as refused, then we hold the charge was properly refused, because there was no evidence tending to show any data from which the jury could have approximately estimated the amount of such expense.

[10] Special charges Nos. 1 and 2, requested by appellant and refused by the court, and complained of in the ninth and tenth assignments, were fairly embraced in the court's charge, and for this reason these assignments are overruled.

The eleventh assignment complains of the court's action in overruling its motion for new trial. The contention is that the motion for new trial should have been granted because the preponderance of the evidence failed to support any, but negatived every, charge of negligence which was submitted to the jury.

[11] This was a question peculiarly for the jury to determine, and it has repeatedly been held that the court will not disturb a verdict on the ground that it is not supported by the evidence, or that it is against the evidence, when there is any evidence in the record which, if true, is sufficient to support the verdict, and it does not appear that the jury was influenced by passion or prejudice and the verdict has been approved by the trial court. Railway Co. v. Taylor, 123 S. W. 715; Railway Co. v. Monell, 50 Tex. Civ.

App. 287, 110 S. W. 504; Railway Co. v. Roberts, 91 S. W. 375.

[12, 13] The twelfth assignment of error is that the court erred in overruling and refusing the defendant's amended motion for a new trial on the assignment that the verdict of the jury was excessive, and that its excessiveness was caused by improper argument and statements of plaintiff's counsel, Mr. M. D. Carlock, wherein the said counsel for plaintiffs said to the jury, in substance, that if the jury would award large damages, they would teach railway companies to keep flagmen at such crossings as the one where the accident occurred for the protection of the public. Mr. M. D. Carlock was one of the attorneys for the appellee at the trial of this case and addressed the jury. While he was addressing the jury, and after he had urged the jury to award the amount of damages asked in the petition, in connection therewith, stated, in substance, that if the jury "would do that"—that is, award damages asked—"they would teach railway companies to keep flagmen at such crossings for the protection of the public." The appellant's counsel at the time excepted to these remarks, whereupon the court instructed the jury that said argument and statement were improper, and that they should not consider the same, and that the court would instruct them as to the law. The court having told the jury that the remarks were improper, and should not be considered by them, we cannot say they were injurious.

Finding no reversible error in the record, the judgment is affirmed.