J. B. KARR ET AL V. PANHANDLE & SANTA FE RAILWAY COMPANY

No. A-4060. Decided November 18, 1953.
Rehearing overruled December 31, 1953.
(262 S.W. 2d Series 925)

*L. A. Wicks,* of Ralls, *Ratliff, Conner & Walker* and *L. D. Ratliff,* all of Spur, for petitioners.

The Court of Civil Appeals erred in holding that there was no evidence to support the jury's verdict that the conditions surrounding the crossing made it extra-hazardous as a night time crossing; that the wooden crossbuck sign, with no reflectors

thereon and located out of the range of head lights of plaintiff's automobile, complied with the provisions of Article 6370, revised statutes; that there was no evidence in the record to support the jury's verdict convicting the railway company of various acts of negligence; in disregarding jury's verdict that plaintiffs kept a proper lookout and were not negligent in failing to listen for the approach of the train, and that his failure to stop within fifty, and not less than fifteen, feet of the nearest rail of the railroad track was a proximate and the sole proximate cause of the accident. LeMaster v. Fort Worth Transit Co., 138 Texas 512, 160 S.W. 2d 224; Missouri, K.&T. Ry. Co. v. Long, Texas Civ. App. 292 S.W. 184, Com. App. 299 S.W. 854, Texas Civ. App., on second hearing, 23 S.W. 2d 401, writ of error refused; Texas & Pac. Ry. Co. v. Day, 145 Texas 277, 197 S.W. 2d 332; Texas La. Power Co. v. Webster, 127 Texas 126, 91 S.W. 2d 302.

*Wigley, McLeod, Mills & Shirley,* of Galveston, *W. P. Walker,* of Crosbyton and *Lewis Jeffrey,* of Amarillo, for respondent.

In reply to the propositions of petitioners cite Texas & N.O. Ry. Co. v. Beard, 91 S.W. 2d 1080; Texas & N.O. R.R. Co. v. Compton, 135 Texas 7, 136 S.W. 2d 1113.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

J. B. Karr, petitioner, brought this suit for himself and his wife and as next friend of his four minor children against Panhandle and Santa Fe Railway Co., respondent, to recover damages for personal injuries sustained by them and for damage to his automobile when the automobile was struck by the engine of respondent's train.

Overruling respondent's motion for an instructed verdict as well as its motion for judgment non obstante veredicto, the trial court entered judgment for petitioner on a jury verdict. The Court of Civil Appeals reversed that judgment and rendered it for respondent. 257 S.W. 2d, 486.

The Karrs were "big football fans," so in the early evening of October 12, 1951, they were going by automobile from near Spur to Slaton, 65 miles distant, to see a football game between Spur and Slaton. Instead of going through to Lubbock to the main highway from Lubbock to Slaton they turned south on farm-to-market road No. 400 (hereinafter called Road 400) to reach the Lubbock-Slaton highway (hereinafter called Lubbock

highway) about 1½ miles from Slaton. Just before it reached the Lubbock highway, Road 400 crossed respondent's right-of-way, which paralleled Lubbock highway with a common boundary between them. As he was almost upon respondent's track Karr was warned by his wife of the near approach of respondent's train from their right; whereupon he "hit" his brakes and the automobile stopped with its front wheels nearer to the south rail than to the north rail. The engine struck the automobile, throwing Mrs. Karr out but leaving Karr and their children in the car. The impact left the body of their automobile from the windshield back virtually intact while knocking all the front loose and scattering it along the right-of-way. All the Karrs suffered some injuries but Mrs. Karr's were the most serious.

The Karrs alleged that the crossing was extra-hazardous as a nighttime crossing because near the point of intersection of the railway track with Road 400 the view of one traveling south on the road is obscured on the west in the direction of the railway line by "houses, trees, barns, telephone poles, the embankment of said road and other improvements situated directly west" of Road 400; at the point of intersection the roadway is practically level and forms a grade crossing; the crossing is not lighted at night and the only warning maintained by the railway company is an ordinary wooden railroad crossing sign situated south of the crossing and west of Road 400 and close to some telephone poles, while the sign's cross pieces are approximately 10 feet high and situated out of range of the lights of an automobile approaching the crossing from the north, in the absence of reflectors; there is no warning sign of any description on the north side of the crossing; at night the view of a person traveling south on Road 400 toward the crossing "is further obscured and confused by the lights of motor vehicles traveling on the Lubbock to Slaton highway to the south, east and west of said crossing and by the lights of motor vehicles approaching said crossing" from the south on Road 400; both the Lubbock highway and Road 400 are heavily traveled; that the railway company operates many trains, both day and night, over the crossing, with its passenger trains normally going over it at not less than 75 miles per hour. Then they allege that "by reason of all of the above and foregoing facts said crossing is an extra-hazardous crossing and * * * is more than ordinarily dangerous to night time travelers approaching it on farm road 400 from north to south and is so peculiarly dangerous that prudent persons traveling said farm to market road at night from the north to the south can not use the same with safety unless extraordinary means are used to protect them"; and that these facts were

known to the railway company or could have been known to it in the exercise of ordinary care.

Except for Special Issue No. 1, in answer to which the jury found that the operation by the railway company of its train at 75 miles an hour over the crossing at the time in question was not negligence, the Karrs' issues were conditioned on an affirmative answer to Special Issue No. 2, in answer to which the jury found that the crossing was extra-hazardous as a nighttime crossing. So they then found that the railway company's failure to have immediately to the north of the crossing a warning which would be visible at night was negligence, which was a proximate cause of the collision; that the failure of the railway company to have the crossing lighted at night as a warning of the crossing's existence was negligence, and a proximate cause of the collision; that railway company's failure to have on the north of the crossing a reflector warning sign was negligence, which was a proximate cause of the collision; that the failure of railway company to have maintained immediately to the north of the crossing a warning device, visible at night, to warn the Karrs of the approach of the train was negligence, which was a proximate cause of the collision; and that the railway knew or in the exercise of ordinary care should have known, "in time to have remedied the condition, that said crossing was an extra-hazardous crossing."

Petitioners' first point is that the Court of Civil Appeals erred in holding that there was no evidence to support the jury's verdict that the conditions surrounding the crossing were such as to render it extra-hazardous as a nighttime crossing.

In their application they say that they "tried this case in the trial court on the theory that the evidence established that the crossing was extra hazardous *at night* because the lights of the vehicles traveling the Lubbock to Slaton highway concealed the lights of a train approaching said crossing from the west, as was the train involved in this collision, until the train was in *point of time* almost upon the crossing and that a person approaching said crossing from the north to the south would not see a train on said track until the train was almost upon the crossing, because such a person would believe the lights of the train to be the lights of vehicles upon said Lubbock to Slaton highway, and further, that the lights of the town of Slaton, Texas, to the southeast of said crossing, would attract the attention of travelers from the north to the south on said paved road and would draw the attention of said travelers away from the

direction from which the train was approaching said crossing, and also that the lights of vehicles approaching on said paved road from the south to the north would distract the attention of travelers from the north to the south on said paved road from an approaching train from the west."

The nature of the issue thus raised has required a detailed study of all the testimony except that of a doctor, which dealt solely with the Karrs' injuries. We have been materially aided by petitioners' statement in their brief in the Court of Civil Appeals, which (except for parenthetical references to the statement of facts) is:

"A jury issue as to the crossing being an extra hazardous night time crossing, due to both fixed and usual conditions surrounding it, was raised by ample testimony showing that the railway line traversed a much traveled paved road at an oblique angle and on a level with the paved roadway; that the appellant's passenger trains usually and customarily traveled over said crossing at the rate of at least 75 miles per hour and that there were several trains daily passing over said crossing; that there was no sign of any description north of said crossing to warn the traveling public on said road of the existence of said crossing or of the approach of appellant's trains thereto; that the appellant's cross buck sign, constructed of wood and with no lights or reflectors thereon was situated 17 feet south of the appellant's railway line and 22 feet west of the paved road, out of the range of automobile head lights; that 80 feet south of the crossing the paved road intersected the main and much traveled paved highway extending from Lubbock to Slaton, which said highway paralleled the railway line at said crossing and for a considerable distance west of said crossing; that said paved road then made a curve to the west, about the width of said road, and continued on south of the Lubbock to Slaton highway; and that the lights of vehicles traveling on said Lubbock to Slaton highway, as well as the lights of vehicles approaching said crossing from the south to the north on said paved road and the lights of the town of Slaton southeast of said crossing, distracted the attention of travelers approaching and using said crossing from the north to the south on said paved road."

Missouri K.&T. Ry. Co. v. Long (Civ. App.), 23 S.W. 2d, 401, er. ref., (first appeal 293 S.W. 184, Id., Texas Com. App., 299 S.W. 854), is cited by petitioners as "the leading case in Texas on the question of distraction and confusion created by

lights and other conditions making a crossing extra-hazardous at night."

In that case the crossing was extra-hazardous because (1) the crossing was flat and was approached by travelers going west, as Long was, on a downgrade from 700 feet back to within 200 feet of the tracks, (2) reflections from lights of the City of Temple, which burned constantly at night, were faced by persons going in the direction Long was, for about 1,000 feet after one turned towards the crossing and from a hill high above the crossing, and any train that might be on it. These conditions existed before Long was killed. Then persons testified to accidents or near-accidents under similar atmospheric conditions during many years, saying it was very difficult to see a moving freight train until very close to it, which situation they escaped by quick turning of their cars to the side and into a ditch. The court held this was rightfully considered by the jury on the issue of extra-hazardous condition of the crossing, and whether by the exercise of ordinary care the railway company should have known of that condition.

Missouri K.&T. Ry. Co. v. Hurdle (Civ. App.), 142 S.W. 992, er, ref., does say, as petitioners contend, that it is not necessary to show that persons are prevented from discovering the approach of trains by permanent obstructions in order to show an extra-hazardous crossing; but the opinion notes (1) that "the situation of objects near the tracks * * * to some extent obstructed the view"; and (2) that it was probable, as illustrated by the circumstances under which Mrs. Hurdle was killed, that one or more of defendant's trains, standing or moving, would prevent one about to use the crossing from discovering the approach of another train to the crossing. Mrs. Hurdle was prevented by a train which she had waited on to clear the crossing from seeing the switch engine which killed her.

Tisdale v. Panhandle & S. F. Ry. Co. (Com. App.), 228 S.W. 133 16 A.L.R. 1264, (op. approved), does cite the Hurdle case, supra, with approval. But it happens that Tisdale's view of the track on which the train which struck him was running was "obstructed by the company itself in the erection of temporary freight and passenger depots between the main line track and the house track, and in other ways * * * and it was difficult to hear the ordinary signals because of the confusion incident to the operation of trains."

Petitioners say that the rule announced in the Long case,

supra, has been followed many times in Texas, and they cite Beaumont, S. L. & W. Ry. Co. v. Richmond (Civ. App.), 78 S.W. 2d, 232, er. dism.; Gulf, C. & S. F. Ry. Co. v. Picard (Civ. App.), 147 S.W. 2d, 303, er. dism.; St. Louis, B. & M. Ry. Co. v. Brack (Civ. App.), 102 S.W. 2d, 261 (no writ history); Texas & N. O. Ry. Co. v. Davis (Civ. App.), 210 S.W. 2d, 195, er. ref., N.R.E.; Texas & N. O. Ry. Co. v. Skeen (Civ. App.) 149 S.W. 2d, 1060, er. dism.; Thompson v. Royal (Civ. App.), 181 S.W. 2d, 317, er. ref., W. M.; and Ft. Worth & Denver City Ry. Co. v. Looney (Civ. App.), 241 S.W. 2d, 322, er. ref., N.R.E.

We shall consider these cases in the order listed. In the Richmond case (78 S.W. 2d, 232) defendant's crossing was blocked by its freight train of 66 cars with the engine at a water tank about 800 feet east and to Richmond's right as he approached the crossing; there were no lights on the train except on the engine and the caboose; Richmond could not see the engine or its lights until he got within less than 200 feet of the crossing because they were obscured from his view by houses and other obstructions along the railroad tracks, and he could not see the caboose lights at all; the crossing was obstructed by a "low-type" flatcar and as Richmond approached he could see the lights of Sour Lake *in front of him* and over the flatcar; and there was testimony that, under the conditions surrounding Richmond, it was "pretty hard" to see a flatcar on the crossing "on account of the lights of Sour Lake."

The Picard case, supra, (147 S.W. 2d, 303), does hold that special and temporary conditions, known by the crew operating the train, could raise an issue that the crossing was *then* more than ordinarily dangerous, thus requiring special warning to persons attempting to use it. However, a controlling condition necessarily known by the train crew before Picard's automobile struck defendant's train was created by the railway company. The crossing was obstructed by a gondola car which was being switched to a junk yard to be loaded with junk for exportation. The gondola car was dark red in color and had a space of at least 3 feet by 21 feet open between its bottom and the street pavement, through which the lights of automobiles approaching from the opposite side could be seen, thereby creating the impression that the crossing was open.

In the Brack case, supra, 102 S.W. 2d, 261, plaintiff's case went on the theory that her husband's death was proximately caused by the defendant's negligence in leaving its train on the crossing more than five minutes, in violation of Art. 787, P. C.,

1925. The court observes that the crossing could have been rendered more than ordinarily dangerous by the conduct of the train crew in the manner of use they made of it; that they were engaged in switching operations discernible to anyone approaching the tracks, which would fortify the belief that the crossing was open; that instead of discharging the statutory duty to clear the crossing in five minutes, the train crew left a low, dark tank car on the crossing with a taller yellow boxcar on either side, thus creating the impression that the train had been broken to leave the crossing open—an impression which two impartial witnesses, who drove up on the opposite side shortly before Brack ran into the tank car, testified they had until they were "within a few feet" of the tank car.

In the Davis case, supra, (210 S.W. 2d, 195), the crossing was not extra-hazardous under ordinary conditions of visibility, but special temporary conditions were held to make it so at the time Davis was injured. Briefly, in the darkness of the early morning hours and while a "light drizzling rain was falling," which, aided by vapors from adjacent industrial plants, caused visibility to be "obscured," the crossing was blocked by oil tank cars; these cars were of a "black or dark" color which did not reflect light well and the wet surface of the road was about the same color as the cars, so that the lack of any contrast between the cars and the pavement, plus the absorption of light by the color of the cars, tended to conceal a tank car upon the crossing from Davis until he was "rather near" the car.

In the Skeen case, supra, (149 S.W. 2d, 1060), the questions decided were whether Skeen was guilty of contributory negligence as a matter of law in driving into the defendant's train and whether defendant's failure to comply with a city ordinance requiring it to have an arc light above the crossing was, as a matter of law, not a proximate cause of Skeen's injuries.

In Thompson v. Royal, supra, (181 S.W. 2d, 317), the defendant maintained 3 parallel tracks which intersected a street at right angles. As Royal approached this crossing he was watching a switch engine on the track nearest him; when he saw that it was not going to move onto the crossing he drove on across; he did not see a passenger train moving toward the crossing on the middle track until the front wheels of his automobile were on the track; his view to the left was obstructed by buildings and by the switch engine so that he could not see the train which hit him until he had passed the track the switch engine was on.

The Looney case, supra, (241 S.W. 2d, 322), involved different elevation levels of the road on both sides of the track as well as the railway track elevation, which together with the effect of automobiles approaching the track and a glow of the lights from the City of Henrietta which appeared over the rails created "an illusion to a person traveling north that there is nothing ahead except open road."

■ These cases clearly hold that an extra-hazardous crossing may arise (1) from permanent conditions, or (2) from temporary conditions which make the crossing extra-hazardous at the time the injury occurs.

But in the latter situation the substantial conditions rendering a crossing temporarily extra-hazardous, must be due to some act or omission of the railway employees, because only under those circumstances could the defendant know or fairly be charged with knowledge that the crossing is temporarily extra-hazardous. This limitation is recognized and applied in Galveston, H. & S. A. Ry. Co. v. Burr (Civ. App.), 291 S.W. 299, er. ref. There the crossing was alleged to have been unusually dangerous at the time of the accident, and what made it so was the fact that two entertainments were then in progress in Harrisburg in honor of its negro citizens "one at a church on one side of the crossing and the other at an auditorium on the opposite side." So it was held that the railway company could not be charged unless it knew of the circumstances causing the dangerous condition.

Although the Karrs did allege that their view to the west toward the railroad was obscured by permanent objects such as houses, trees, and telephone poles, they made no mention of it in stating the theory upon which they tried this case or in their statement of the testimony supporting their claim that the crossing was extra-hazardous. This omission may have been due to the fact that a measurement on the ground showed that of the group of buildings on Karr's right as he approached the crossing the nearest one was 623 feet from the crossing and 89 feet from Road 400; that the telephone poles and the few trees there offered no noticeable obstruction to one's view to the west; and that Karr himself admitted on cross examination that after he passed these buildings there were no obstructions to his view "to the westward."

■ Petitioners urge the absence of a crossing sign on the north side as a fixed and continuing condition which helps in rendering

the crossing extra-hazardous at night. Art. 6370, R. S. 1925, requires railroads to "erect at all points where its road shall cross any first or second class public road, at a sufficient elevation from such public road to admit of the free passage of vehicles of every kind, a sign with large and distinct letters placed thereon, to give notice of the proximity of the railroad and warn persons of the necessity of looking out for the cars." The result of this language is that if the railway erects such a sign no point can be made that it put the sign on the wrong side of the crossing, provided the single sign is reasonably adequate as a warning, and it relieves the railway company of any duty to erect a second sign or any particular kind of sign, unless it be established that the crossing is extra-hazardous, and it is not a condition to be considered in determining whether the crossing is extra-hazardous.

In an effort to show that the crossing sign, on the south side of the crossing, was not adequate as a warning, the Karrs alleged that its cross pieces were approximately 10 feet high and out of range of the lights of automobiles approaching the crossing from the north, "in the absence of reflectors." In pointing out the evidence which they claim is "ample" to prove that the crossing was extra-hazardous the Karrs say that the sign, made of wood and with no lights or reflectors on it, was situated 17 feet south of the rail line and 22 feet west of the pavement on Road 400, "out of the range of automobile head lights." Karr's testimony was that the sign was 15 feet from the pavement on the west side of Road 400, with its cross 10 feet from the ground; that he learned this *after* the collision because he did not see it at all as he approached the crossing *before* the collision; that after he got onto Road 400 he drove with his headlights dimmed out of consideration for the driver of the car ahead of him which he had trailed continuously up to the time of the collision at a distance of from 50 to 75 feet; that the sign was white with black lettering on it "like the railroad signs you see at every crossing"; that his headlights from 50 feet away would reach as far as 15 feet from the pavement; that "back at a distance" (which he declined to estimate) his headlights "would have reached out for that fifteen feet"; that they were reaching high enough vertically to embrace the back of the car he was trailing, when it was 60 feet away, which would be high enough to reach the "white post of that sign * * * if the post starts at the ground" but not the crossbars on the sign. While Karr was a stranger to Road 400 and its intersection with respondent's rail line, he was not relieved of his duty to look and listen for dangers that he could

have seen or heard had he looked and listened. But with the whole family in holiday mood on their way to a football game and elated over the fact that their soldier son and brother would be home in a few days to visit them, it is obvious that Karr was not concerned about anything else. So, he said, he was watching the road "more or less." What he really was doing was to rely on what the car ahead of him did. This is established by his testimony that when he was 100 feet back from the railway crossing he was driving around 12 miles per hour and the car was gradually slowing itself down because "I knew I was approaching a stop sign on the highway, and the car ahead of me, I could see his lights, his taillights slowing down"; and that as he neared the crossing he was looking directly ahead, "more at the car that was ahead of me, because I knew that if it slowed down and stopped that I'd have to stop right behind it." (When asked why she did not see the sign painted white with black lettering on it, Mrs. Karr said: "Well, I suppose it's because the — we were watching the car ahead and had — we did have our lights down * * * to keep from shining in the other car and not thinking of such a thing, I just wasn't looking upward.") In that situation Karr neither saw nor heard respondent's train of 15 cars, most of which were lighted passenger cars, pulled by a Diesel engine bearing down on the crossing, whistling and ringing its bell, with its regular headlight on bright as well as a gyro light which moved in an arc like a pendelum throwing its light from side to side along the track, which the engineer said could be seen for miles.

■ We have decided that Karr's testimony alone conclusively shows that he did not see the sign because he was relying on the driver ahead to see it, and that is no proof that the sign was inadequate.

■ Another permanent condition which Karr contends rendered the crossing extra-hazardous was that as he approached the crossing he was on an oblique angle of 55° and 34' until he was 111 feet of the center line of the railway track where a "slight jog" made the angle one of 63°. He argues that this would mean that he would have to look backward instead of merely to the right as would be the case had the angle been the usual 90°. We have studied two cases involving a crossing at an acute angle, but no significance appears to have been given to that fact by the courts. See Texas & N. O. v. Davis, supra, (210 S.W. 2d, 195, 197), and Jones v. Boston & M. R. R., 83 N. H. 73, 139 Atl., 214, 215. We attach no significance to it here. Karr said that when he was 100 feet from the crossing when the angle was at 63° he was

running 12 miles per hour. So the train going at 75 miles per hour would necessarily have been 625 feet from the crossing in order to collide at the crossing with Karr. It could not have required much looking backward for him to see the train had he looked.

■ There is left but the matter of lights. As to the lights of the City of Slaton the claim is that they "distracted" or "drew away" Karr's attention from the direction from which the train was approaching the crossing. These lights were off to Karr's left and there is no claim that they produced any glare or any other condition which would have impaired Karr's vision or otherwise rendered it impossible or more difficult for him to see dangers on Road 400 had he been looking for them, instead of at the lights of Slaton. Therefore in this contention the Karrs can find no support in the cases they cite and which we have discussed, e. g., the Long case, supra.

As to lights on the highways, the Karrs assert specifically that the lights of "vehicles" traveling the Lubbock highway to Slaton "concealed the lights of a train approaching said crossing from the west, as was the train involved in this collision, until the train was in point of time almost upon the crossing" so that one approaching the crossing as they were would not see a train until it was almost upon the crossing because he would believe the lights of the train were the lights of vehicles on the Lubbock highway. On this issue there was testimony that the engine lights were at least 12 feet from the ground and respondent suggests it is common knowledge that automobile lights are only about 3 feet from the ground. Hence, it is argued that this difference in height made it impossible that one could confuse the engine lights with the automobile lights on Lubbock highway.

■ We have concluded that it is immaterial whether the automobile lights on Lubbock highway concealed the lights of respondent's train until the train was almost upon the crossing. For if that be conceded the fact remains that the many lights on the highway was due to the fact that a football game was about to begin in Slaton and people were pouring in from all directions in that area to see it. This is a matter of common knowledge, which is corroborated to some extent by the fact that five witnesses who testified accounted for five automobiles headed toward the game at the time of the collision. The situation was at most only temporary; it was infrequent; it did not exist with any regularity; it was not in any way contributed to by any act or omission of respondent's employees or agents so as to charge

respondent with any knowledge of its existence. It is noteworthy that there was no testimony whatever that anybody had suffered any accident or near-accident at the crossing under similar conditions prior to the night in question, as there was in the Long case, supra. On the contrary, the fireman on the train at the time the Karrs were hit and who lived at Slaton, testified that he had never known or heard of any other accident or near-accident at the crossing between trains and vehicles of any kind.

Our conclusion renders it unnecessary to pass on other questions raised in petitioners' application.

The judgment of the Court of Civil Appeals is affirmed.

Opinion delivered November 18, 1953.

MR. JUSTICE GRIFFIN, joined by Justice Smith, dissenting.

I agree with the holding that this crossing does not constitute an extra-hazardous crossing. However, an examination of the record leads me to believe that the respondent might be liable under allegations and proof of simple negligence. I think this case should have applied to it the same rule which we applied in the recent cases of Eaton, et al v. R. B. George Investments, Inc., 152 Texas 523, 260 S.W. 2d 587 and Benoit v. Wilson, et al, 150 Texas 273, 239 S.W. 2d 792. Rule 505, Texas Rules of Civil Procedure.

For that reason I would reverse and remand this cause to the trial court for another trial instead of reversing and rendering.

Opinion delivered November 18, 1953.

Rehearing overruled December 31, 1953.