**GREAT AMERICAN INSURANCE COM-PANY, Appellant,**

v.

**Carroll R. LANG d/b/a Lang's Jewelry, Appellee.**

**No. 11483.**

Court of Civil Appeals of Texas.

Austin.

May 31, 1967.

Rehearing Denied June 28, 1967.

Thompson, Coe, Cousins & Irons, Larry L. Gollaher, Dallas, for appellant.

Wynne & Wynne, B. J. Wynne, Wills Point, for appellee.

O'QUINN, Justice.

The Langs owned and operated a jewelry store in Wills Point. One night late in August, 1964, burglars broke into the store and stole jewelry and other property valued at between $4,000 and $5,000. The Langs reported the burglary to the Great American Insurance Company from whom they had purchased a "jewelers' block policy" about a year before the burglary.

The insurance company, after an investigation, refused to pay the loss and denied liability under assertion the Langs had breached their warranty to keep sixty-five percent by value of the insured property, when the store was closed, in the store's safe, which was described in the policy. The burglars did not open the safe, and the only property stolen by them consisted of items in the store found outside the safe.

The Langs brought suit on the policy claiming a loss of $6,000, the maximum limit of the policy. The insurance company pleaded in answer, among other defenses, that the Langs failed on the night of the burglary to have sixty-five percent by value of the insured property in the store safe, in violation of their warranty to maintain this percentage, when the store was closed, inside the safe. The case was tried to a jury, and the jury found in answer to special issues that the loss amounted to $4,368.-43 and that on the night of the burglary the Langs had sixty-five percent by value of their stock, "including other people's goods," in a locked safe.

At the close of all the evidence, the Great American Insurance Company moved for an instructed verdict which was denied by the court. Upon return of the jury's verdict, the insurance company moved for judgment notwithstanding the verdict. The court denied the motion and entered judgment June 2, 1966, for the Langs in the amount of $4,368.43, with interest from November 15, 1964.

Great American Insurance Company excepted to award by the trial court of interest prior to judgment, and, without first moving for new trial, perfected appeal from the judgment, pursuant to Rule 301, Vernon's Ann. Rules Civ.Proc.

Appellant assigns two points of error, contending (1) that the trial court should have rendered judgment for appellant non obstante veredicto because the evidence established as a matter of law that appellees breached the warranty and condition to keep sixty-five percent by value of the insured property locked in the store's safe when the business was closed, and (2) that the trial court, notwithstanding the verdict, should have found for appellant because the evidence established that the safe warranty, condition, or representation breached by appellees was material as a matter of law. These assignments are related to appropriate parts of appellant's motion for judgment non obstante veredicto.

The question is whether, as appellant contends, there is no evidence to support the jury's finding, in answer to special issue No. 4, that on the night of the burglary appellees had, locked in their safe, sixty-five percent by value of all property insured under the policy. The policy covered not only the stock of merchandise in the store, but also customers' property, such as watches being repaired and diamonds held as "layaways."

It appears that on the day following the burglary Herman Tiller, an insurance adjuster acting for appellant, started working with the Langs at their store to determine the extent of the loss.

By using a known inventory prior to the burglary and adjusting it from records of sales and purchases, they arrived at an inventory of stock on hand the night of the burglary. An inventory of property on hand the day after the burglary was made, and the difference between the two inventories was taken to be the loss by burglary.

The results arrived at by Tiller and by the Langs differed less than $100. Tiller produced a figure of $7,897.10 for the inventory before the burglary, and the Langs found it to be $7,991.79. They agreed on a physical inventory of $3,458.67 after the burglary. Deducting this figure, Tiller found the loss to be $4,459.40, and the Langs found a loss of $4,533.12.

In making the inventories, the Langs kept a separate list of customers' property, all of which Leona Lang testified they kept in the safe. Tiller did not look into the safe himself. The contents of the safe were taken to Tiller at a counter about ten feet from the safe by Lang when Tiller asked what was in the safe. Tiller apparently made no inventory of the items in the safe belonging to customers, but confined his list to property of the Langs.

Leona Lang testified that they kept no customers' items outside the safe. Even watches awaiting repair were locked up. On the night of the burglary there were 85 customers' watches in the safe, which Carroll Lang testified had a reasonable market value of $3,400, or $40 each. Leona Lang testified that in addition to the 85 customers' watches, the safe contained three layaway diamond rings worth $879, and the Langs' important diamonds costing $50 or more, worth $1,373.89, a total in the safe of $5,652.89.

In this connection, on direct examination, Leona Lang testified as follows as to the contents of the safe on the night of the burglary:

"Q   What was in the safe that night, if anything?

A   You mean before—well, our important rings, every item that we had that cost over $50, our customers' watches, and some layaway merchandise.

Q   About how many watches in that safe that night?

A   Eighty-five.

Q   Now, was there any customers' layaway?

A   Yes, there were three rings.

Q   Do you remember their value?

A   Yes, I do.

Q   What was their value?

A   Well, the total value, was $879.00

Q   And how many diamonds was in the safe?

A   You mean of our own?

Q   Yes.

A   I don't believe I have that over here. It was the same—$1373.89.

Q   Now, you made that?

A   This is my writing.

Q   You made that right after the robbery?

A   Yes, sir.

Q   You and Mr. Lang went over the customers' watches and jewelry, or just over the jewelry, you and he together, after the burglary, you and Carroll?

A   We went over all of it, Carroll and I did."

On cross examination, Leona Lang was asked whether she had "related * * * everything that was in the safe on the day of the burglary," and she answered, "I believe so."

It was undisputed at the trial that the initial inventories taken by Tiller and the Langs did not include customers' property, and that these values must be added to the first invenory to determine the value of all property in the store covered by the policy at the time of the burglary. The value of the three diamonds and the 85 watches belonging to customers was $4,279. When added to Tiller's figure for the inventory before the burglary, the insured property was $12,176.10, and when added to the Langs' figure, the total was $12,270.79.

The value of property in the safe the night of the burglary, as established by the testimony of the Langs, was $5,652.89. Thus it seems clear that on the night of the burglary the Langs had $6,617.90 by value outside the safe, or more than half the total insured property.

The warranty pleaded by appellant appeared in paragraph 18 of the proposal executed by Carroll R. Lang in applying for insurance. The proposal, when accepted by the company, was attached to the policy and became a part of the contract. Paragraph 18 is headed:

"18. Warranties as to Property Insured During Term of Insurance at All Times when premises are Closed:"

Under this heading calling for warranties, Lang's proposal read:

"(2) The proportion by value of property on premises kept in other Locked Safes and Vaults will be * * * 65%

(3) The proportion by value of property on premises (including window display) out of Safes and Vaults will be * * * 35%."

Paragraph 17 of the proposal, headed "17. Safes and Vaults," described in subpara-graph "a," calling for "full particulars of each safe or vault," the following safe:

"Reliable Safe & Lock Company, Covington, Ky. Width of door 5½" Serial # 2438L."

Under other subparagraphs of paragraph 17 space was provided for description of electrical burglar alarm systems, time locks, tear gas systems, and other protective devices or methods, but none was shown by Lang in his proposal. The safe was the only protective device proposed by Lang.

The last paragraph of the proposal, immediately above the signature of Carroll R. Lang, reads:

"Signing this form does not bind the Proposer to complete the insurance, *but this Proposal shall constitute a warranty should a policy be issued.*" (Emphasis added.)

The policy in paragraph 1 provides, "In consideration of the premium above specified, and of the Proposal(s) and Declaration(s) dated the 10th day of September, 1963, attached hereto and made a part hereof and which is (are) hereby agreed to be the basis of this policy, and which the Assured hereby declares to be true as to each and every statement and particular contained therein, this company does insure Lang's Jewelry * * *."

In paragraph 8 the policy provides under its "general conditions," *"It is a condition of this insurance* that * * * (B) The Assured will maintain during the life of this policy, insofar as is within his or their control, watchmen and *the protective devices as described in his or their proposal form* or endorsements attached hereto." (Emphasis added.)

Under Special Issue No. 4 the jury answered, "Yes," to the question, "Do you find from a preponderance of the evidence that at the time of the loss, if any, the Plaintiffs had sixty-five percent (65%) by value of their stock on the premises, in-

cluding other peoples' goods, if any, in a locked safe or vault?"

The trial court also submitted five special issues, numbered 12 through 16, to be answered only if the jury answered "No" to issue No. 4. These issues asked findings as to value of property inside and outside the safe, whether failure to keep sixty-five percent of the stock in the safe was material to the risk, whether this failure contributed to the burglary or loss, and whether the provision of the policy regarding sixty-five percent of stock in the safe was material to the risk. Since the jury answered No. 4 "Yes," the issues 12 through 16 were not answered.

The record in this case is such that we are called upon to decide whether there was evidence to support the jury's finding that the Langs had sixty-five percent of the insured property locked in their safe the night of the burglary. Stated conversely, the question is whether the evidence establishes conclusively that sixty-five percent of the insured property was not in the safe that night. Another approach is to decide whether there is a complete absence of evidence to support the jury's finding on this point.

Whatever approach is made or however the question is treated, we have in this record the so-called "no evidence" point of error, which, as pointed out by Justice Calvert in 1960, if sustained, calls "for reversal of the trial court's judgment and rendition of judgment for the appellant." 38 Tex.L.Rev. 361, 362, (1960), " 'No Evidence' and 'Insufficient Evidence' Points of Error," Robert W. Calvert (Chief Justice, then Associate Justice, the Supreme Court of Texas). "In whatever language the point may be couched," Justice Calvert wrote, "its essence is that there is an absence of proof of a vital fact and that the trial court erred in not rendering judgment for the appellant." 38 Tex.L.Rev. 361, 362.

All of the proof as to value in this case was supplied essentially by the Langs. The inventory Tiller prepared was taken from records furnished him by the Langs from their store books and papers. The inconsequential difference of less than $100 between Tiller's total and the Lang total obviously was traceable to the arithmetic of adding purchases and subtracting sales. The physical inventory they made together, based on value figures supplied by the Langs, was concurred in by both. The small difference in net loss between Lang and Tiller, Leona Lang testified, was due to the same minor difference found in the two inventories of property in the store before the burglary.

The vital proof needed to show how much property by value was in or out of the safe the night of the burglary lies in ascertaining the value of property known to be in the safe and untouched by the thieves. Tiller did not list or inventory the watches and diamonds in the safe belonging to customers. This proof was furnished exclusively by the Langs.

Asked about Tiller's arrival at the store after the burglary, and subsequent taking of inventories, Leona Lang testified as follows:

"Q What did Mr. Tiller tell you?

A That he would like an inventory of the complete stock, of the purchases, of the last inventory until the date and—

Q Why did he tell you he wanted it?

A To arrive at our loss.

Q Okay. Did you proceed to give him all of the information that he wanted?

A Yes.

Q Did you get your inventory down for the year?

A Yes.

Q What else did you give him?

A Well, he looked at all of our books, our purchases, and all of the sales

slips, everything he asked for, I gave him.

Q And when you would give it to him, what would happen?

A He would write it down, what he wanted.

\* \* \* \* \* \*

Q Is it true that you do actually most of the book work or accounting for the Lang Jewelry Store?

A Yes, sir.

Q Do you have your own figures, which would be something similar to Defendant's Exhibit 3? [Tiller's inventory]

A Yes.

Q Do those figures on Defendant's Exhibit 3 coincide or are they fairly in line with what you determined yourself?

A Fairly well, yes.

Q Say, for example, the inventory prior to the burglary.

A Yes. It is what I have.

Q What is the figure that you have?

A $7991.79.

Q So that is just maybe $100—

A Yes.

Q And yours is $100 more than Defendant's Exhibit 3?

A Yes.

Q And then is your statement on what you determined to have been taken approximately the same, $3,458.67?

A That was the inventory.

Q Do you have a loss figure?

A Yes: $4,533.12.

Q So again, maybe a hundred above?

A Yes.

Q That is the same one hundred? That would be accounted for, would it not, by your beginning inventory being $100 higher?

A Yes, sir.

Q Do your figures take in everything that was taken on the premises?

A This figure does not cover the watches and diamonds that Mr. Tiller did not ask for.

Q Which figure?

A That I have just quoted to you, that is our inventory, salable merchandise.

Q All right; so then, what is the $3500?

A Approximately $3400 and $879 for layaway diamonds, that is not in that figure.

Q Both of those are not, but the diamonds were for sale?

A In the figures.

Q Are included in that figure?

A Yes.

Q No, does this inventory include customers' items outside of the safe, if there were any?

A I wouldn't have any.

Q You don't have any customers' items outside the safe?

A Yes, sir.

Q Is that true even before watches are worked on?

A Certainly.

Q Then that eighty-four or eighty-five customers' watches, that is the sum total of all the watches on the premises at the time of the burglary, is that correct?

A I believe so."

Carroll Lang, testifying on the contents of the safe and the values of items found there, gave his evidence as follows:

"Q * * * Is it your testimony regarding what was in the safe there was the $1,373 in diamonds, is that correct?

A That is what they said it was.

Q Who is 'they?'

A Mr. Tiller.

Q And your wife?

A Whoever figured it up. They done the figuring. I didn't do any of the figuring.

Q You didn't have anything to do with that?

A I didn't have anything to do with the figuring.

Q Is there any question in your mind that that figure is inaccurate?

A No.

Q Now, did you work up the figure on the watches yourself?

A On the watches?

Q On the watches that you testified there were 85 inside the safe?

A Yes.

Q Did you work up the figure that those 85 watches were worth $3400?

A Yes, sir.

* * * * * *

Q You have some memory regarding layaway items?

A Yes.

Q Did you count or evaluate those?

A No.

Q Who did that?

A Oh, yes, I counted it when they found them, yes.

Q When you found them?

A Oh, when we went back into the safe later on.

Q Did you work up the figures on the value on those?

A Well, you didn't have to work any figures on them. We had the figures on them.

Q How is that?

A Because we had them in a book, yes.

Q But you had to add them together? There were how many rings?

A Two sets, and then there was one solitaire.

Q All right; did you add together those prices and come up with $879?

A Yes, sir, that is the wholesale value of them.

* * * * * *

Q Do you recall testifying yesterday that 85 watches in your safe were worth $3400?

A Yes.

Q That comes to $40 apiece?

A Yes.

Q How did you assess the values on them?

A Well, just tried to meet a happy medium.

Q Just a happy medium?

A Watches that have been—just got to meet a happy medium on them because they run anywhere from $25 to $100. You have got to have a medium somewhere there."

It is uncontroverted that the safe contained only three properties. Besides the tray of diamonds belonging to the Langs, there were three diamond rings in layaway and 85 customers' watches. Leona Lang supplied the value of $1,373.89 for the tray

of diamonds from store books. Carroll Lang verified the value of $879 on the three layaway diamonds because he "had them in a book." The only items on which the value was an estimate or appraisal were the 85 customers' watches. The figure supplied by Carroll Lang, who had been in the jewelry business nineteen years, was $3,400, or $40 each.

Appellees argue that Carroll Lang's testimony as to value of the watches was qualified by his statement that $3,400 was in the "neighborhood" of "fair market value" and that this was a "conservative estimate." Later, as already quoted, he testified that the value of $40 each, making a value in all of $3,400 for 85 watches, was to meet a "happy medium" between a low of $25 for the cheapest and $100 for the best.

On the unlikely theory that the jury seized upon this testimony and sought to raise Lang's appraisal as an experienced jeweler from $40 per watch to a mathematical "happy medium" of $62.50 per watch, the increase, when added to both the property in the safe and the total inventory, would place the property in the safe at $7,565.39, or 53.34 percent, and leaves it well short of sixty-five percent.

Returning to the figures produced by the Langs, and not contradicted by any other evidence, the total inventory before the burglary was $12,270.79, with only $5,552.89, or 46.06 percent, in value locked in the safe. To comply with the warranty of sixty-five percent, there should have been locked in the safe property having a value of $7,976.01. With $6,617.90 established as the value of property not in the safe when the thieves arrived, a finding by the jury that sixty-five percent was in the safe would require that the safe have in it property worth $12,289.55, which would be in excess of the undisputed total inventory of insured property.

Appellees take the position that the jury was not bound to accept any of the testimony as true, did not have to accept the figures given as to value, and could from the figures given deduct and construct their own conclusions and make their own calculations.

We cannot agree, under the facts of this case, that the jury may go as far as appellees suggest. The figures most favorable to support of the jury's finding were arrived at from values supplied by the Langs from their own records, and all values, except the value of the 85 watches, were established by the store's books. Neither the Langs nor the insurance company sought to produce or prove any other than those values. For the jury to deviate from the known figures would be, not merely to reject the testimony, but to invent and substitute testimony, which the jury may not do.

The value of the 85 watches was established by the uncontradicted testimony of Carroll Lang at $3,400, or $40 each. But if the jury went above the mathematical "happy medium" of $62.50 for each of the 85 watches, and used any unit of value, not exceeding the top limit of $100 mentioned by Lang, the jury could not have found that the insured items in the safe by any calculation constituted as much as sixty-five percent of the total insured property.

Appellees contend that the only witnesses testifying to facts upon which the jury's answer to issue No. 4 could be predicated were interested witnesses, and that their testimony in relation to value was that of experts and in places contradictory. We do not find anything in the record to show there was any dispute or contradiction as to value. Tiller, who attempted only to give an over-all total of insured property, inventory on hand, and the loss calculated as the difference, took his values from the Langs and the records in their store. All evidence on value came from Carroll and Leona Lang, and they were in agreement between them.

The fact Lang was an expert, after nineteen years' experience in the jewelry busi-

ness, does not take away from validity of the values he placed on the 85 watches, but if anything should fortify his testimony. In any event, there were no conflicting theories and methods of calculation affording the jury a field in which to speculate. The outer limits were fixed by Lang, and the jury was bound by these limits in whatever calculations the jury made to arrive at a percentage of property in the safe.

While the jury is accorded extensive latitude in seeking its answers, this authority does not license voyages into pure surmise, suspicion, or speculation. The jury's journey must follow charts within the realm of reality, found in the facts made known by the evidence.

It is understandable that a jury, with commendable sympathy for a local merchant, may wish to aid him in his plight, and they may hold his testimony in higher regard than that of other witnesses. Yet in this case the testimony of the Langs, viewed in complete disregard of any other evidence, which they gave with laudable candor and forthrightness as to what items were in the safe and their values, makes it impossible for them to escape, even with the aid of the jury, from the plain fact that sixty-five percent in value of the insured property was not locked up in the safe when the thieves broke in and took away more than $4,300 in property lying outside the safe.

The holding of the court in Kerr v. State, Tex.Civ.App., Austin, 205 S.W. 474 (1918), rehearing denied Tex.Civ.App., 206 S.W. 363 (no writ), although there concerned with a jury finding in a land boundary suit, is in point in this lawsuit. In the Kerr case the evidence comprised 25 sets of field notes, 13 patents, 11 maps, 8 file wrappers from the land office, and a connecting run by a surveyor. The Court found that there was no contradiction in the testimony and that the verdict of the jury was "simply their deduction from the facts proven". After making deductions of its own from the facts and figures, the Court

concluded that the verdict of the jury was not supported by the evidence.

The court pointed out that not to disturb the verdict on appeal might be " * * * a convenient method whereby an appellate court may avoid the labor of investigating a voluminous and complicated statement of facts and the responsibility of making the proper deduction therefrom."

After making its investigation, the court found that the deductions of the jury were not consistent with the facts, and the court said it was "not impressed with the sacredness of such verdict."

The court denied " * * * any assumption of superior ability to say that the court with such testimony before it, in writing, and ample time to examine same, is in a better condition to make a proper deduction from such testimony than is a jury, especially as the members of appellate courts, both as practitioners at the bar and members of the court, must necessarily have had more or less experience in such cases, whereas the jurors have probably had no such previous experience." 205 S.W. 474, 476, col. 2.

■ In the cause now before this Court it was shown by the uncontradicted testimony of the Langs what value of insured property was in the safe and what was out of the safe. The jury, from facts and figures proved by this testimony, made the deduction that sixty-five percent in value was locked up in the safe when the burglars broke into the store. This deduction simply will not stand up under the facts, and the verdict of the jury is therefore not supported by the evidence. Based on the figures given by the Langs, and not disputed by any other testimony, the inventory of $12,270.79 in insured property on the night of the burglary was maintained so that $6,617.90 in value, or 53.94 percent, was outside the safe and exposed to the thieves, while only $5,652.89, or 46.06 percent, was protected by being locked up in the safe. This means that the Langs missed compli-

ance by 30 percent, which is a substantial default.

■ The finding of the jury must be within the range of the testimony and must be supported by the evidence. When this test is applied, we find that the jury's answer to issue No. 4 is without support. There is a complete absence of evidence to support the answer given by the jury. The jury's answer to Special Issue No. 4 has no force and effect and should be set aside. Panhandle & Santa Fe Ry. Co. v. Karr, Tex.Civ.App., Amarillo, 257 S.W.2d 486, affirmed in 153 Tex. 25, 262 S.W.2d 925 (1953); Kerr v. State, supra.

The warranty considered in this case, being a requirement of something to be done after the date of the policy, belongs to the class of provisions called "promissory warranties." Home Insurance Co. v. Henderson, Tex.Civ.App., Texarkana, 263 S.W. 650 (no writ); 32 Tex.Jur.2d, Insurance, sec. 240, p. 404.

Appellees invoke Article 21.16, V.A.T.S. Insurance Code, dealing with misrepresentations by policyholders, and assert its applicability. This statute, first enacted in 1903, has been carried forward in each code revision, including the insurance code. (Acts 1903, 28th Leg., ch. 69, p. 94; Art. 4947, R.S. 1911; Art. 5043, R.S. 1925; Acts 1951, 52nd Leg., ch. 491).

This statute reads as follows:

"Any provision in any contract or policy of insurance issued or contracted for in this State which provides that the answers or statements made in the application for such contract or in the contract of insurance, if untrue or false, shall render the contract or policy void or voidable, shall be of no effect, and shall not constitute any defense to any suit brought upon such contract, unless it be shown upon the trial thereof that the matter or thing misrepresented was material to the risk or actually contributed to the contingency or event on which said policy became due and payable, and whether it was material and so contributed in any case shall be a question of fact to be determined by the court or jury trying such case."

Promissory warranties are distinguished from statements, representations, and answers furnished in applying for insurance or contained in insurance contracts, and have been held not to be affected by the statute. Home Insurance Co. v. Henderson, supra. The doctrine of promissory warranties recognized by the courts prior to enactment of the statute was not overthrown by the legislature in 1903. Gross v. Colonial Assurance Co., Tex.Civ.App. (1909), 56 Tex.Civ.App. 627, 121 S.W. 517 (no writ).

The warranty language contained in the proposal appears twice, once in relating percentages to be kept in and out of the locked safe, and again immediately over the signature of Carroll R. Lang as the proposer and applicant for insurance. The proposal became a part of the policy, and the policy provides that maintenance of the safe, which was Lang's only protective device, is a condition of the insurance.

By uncontradicted testimony at the trial it was shown that the premium paid for the insurance was based upon the proposal as to what percentage would be kept locked in the safe when the store was closed. The premium on property locked in the safe was shown to be one-half the premium for the same values not in the safe.

John Wascomb, a senior underwriter employed by appellant insurance company, testified that he had worked in the insurance business twenty-four years, about fifty percent of that time being as an underwriter, a duty imposing "the responsibility of either accepting or declining a risk." He testified to familiarity with the "jewelers' block policy" and with the mechanics of working up a proposal and issuing a policy on the proposal. With reference to the purpose of a proposal in rating a policy

and computing premiums, Wascomb testified as follows:

"Q What purpose does the proposal have as far as rating is concerned, or as far as premium computation is concerned?

A As far as rating is concerned, it has a great deal to do with it, because you can have two jewelers with the same inventory and have two different premiums based upon the amounts in show windows, amounts outside and amounts in the safe at night.

Q Can you tell us what effect the provisions regarding what is in safes at night or whenever the premises are closed, what effect that has on the premium?

A The premium is based on the amount in the premises, and on the percentage of the safe at night. The premium is reduced by 50 percent on fire and other perils.

Q Explain to the jury what you mean by that.

A The premium is based on the fire rate and also has a flat charge, based on a schedule, first $25,000 so much, and next in layers, but we have you charged for the other perils, excluding burglary.

Q Then what you are saying is that the premium is exactly half as much on what is inside the safe as what is outside the safe?

A That is correct.

Q Who establishes that rate that you are speaking of?

A The rate is actually established over a period of years on experience, but the original formula was set up and has been revised once, about five

years ago. It has worked out very well.

Q Who compiled the statistics that is used to come up with this?

A The Inland-Marine Insurance Bureau, and they filed with the various states.

*     *     *     *     *     *

Q My question was, on this particular policy, could the Great American Insurance Company have charged a different premium than what appears on the policy itself?

A No, we could not have, because we have filed those forms and rates with the State, and to use any other rate, our premium would have been discrimination.

*     *     *     *     *     *

Q As an underwriter for the Defendant in this case, and again I call your attention back to the provisions in Paragraph 18 of the proposals regarding the amount in safes, if there was less than 65 percent value of the insured property, plus other people's, customer's property in that particular safe, would you have accepted this risk at the premium charged?

A No, we would not have.

Q Now, based upon figures which have been introduced here in evidence, would you be capable of computing what the premium would be?

A Yes, from the proposal you can compute the premium.

Q All right; do you have a pencil and paper?

A I warn you it will take about 45 minutes. That is the reason we send them to the Bureau. We very seldom figure them in Dallas.

Q Can you say unequivocally if there was less than 65 percent by value,

as I have already stated, that the premium would be higher?

A Yes, because we gave him credit for half of the rate for the property in the safe after night."

It was shown at the trial that the "jewelers' block policy" had its origin about 1920, and since that time the policy and the proposal upon which it is based have become more or less standard. The Inland-Marine Insurance Bureau, of which appellant is a member, prescribes contracts and proposals for such policies that are identical for all bureau members. The bureau forms for proposals and policies used in the jewelry business are accepted in Texas. Under the standardized system of issuing a "jewelers' block policy," the merchant executes a proposal which is submitted to the insurance company, and often reviewed by the bureau, for purposes of establishing a rate and approving issuance of the policy. When the rate is ascertained and the policy issued, the policy, with the proposal attached, is sent to the local agent for delivery to the insured. This procedure was followed when the policy in this case was issued to the Langs.

We do not find that any Texas court has construed provisions of the "jewelers' block policy" or decided a question involving the promissory warranties or representations of such policies.

This type of policy has been construed by other jurisdictions in recent years. Where a representation had been made that the jeweler's inventory had not exceeded $130,000 during the year previous to issuance of the policy, when in fact it had exceeded $150,000, a federal appellate court affirmed a judgment for the insurance company, after a robbery, upon showing that if the inventory figures had been accurate the policy would have been issued at a higher rate. Chalom & Son, Inc. v. St. Paul Fire & Marine Insurance Co., U.S.C.A., 2d Cir., 285 F.2d 909 (1961).

In that case the court found that New York statutes, applicable in the case, provided that the misrepresentation by insured must be material to the extent that the insurer would not have made the contract knowing the true facts. It was found that insurer would not have issued the policy in this case at the premium actually charged. In addition, the court found that under New York law issuance of the policy at the premium actually charged, when in fact the inventory was higher than represented, would have been discrimination in violation of the insurance statutes. 285 F.2d 909, 911, col. 1.

In Phoenix Insurance Company v. Ross Jewelers, Inc., U.S.C.A., 5th Cir., 362 F.2d 985 (1966), the court found that the provision of a standard "jewelers' block policy" that the assured would maintain the protective devices described in the proposal was a promissory warranty as well as a condition.

In that case one of the protective devices attached to the vault was an alarm system connected with a police station. The system was activated or deactivated by a key. On leaving the store at night, the manager activated the system, but left the key in the device. When burglars entered the store that night, they simply turned off the alarm with the key conveniently left in the mechanism, broke open the vault and stole more than $65,000 in jewelry. The court held there was a breach of the policy requiring maintenance of the alarm system, and that, in the absence of estoppel or waiver, the breach prevented recovery for the loss of jewelry taken from the vault.

In the case before this Court, the Langs did not maintain the safe, the only protective device they had, as they warranted to maintain it, for they did not have, locked up from thieves, at least sixty-five percent of the insured property on their premises. Without this warranty, the insurance company would not have issued

the policy, certainly not at the premium charged on the warranty that approximately two-thirds of the insured values would be locked up at night in the safe the insured described in his proposal.

We think under the facts of this case the provision regarding the safe was a promissory warranty and a condition. Appellees having breached the contract are not entitled to recover for their loss.

The fact that the burglars did not open the safe shows, at least with reference to this loss, that the safe, as a protective device, was a sound basis for determining the premium to be charged, as well as basis for decision of the company to issue or not issue the policy. The safe and a warranty to maintain it, with sixty-five percent of value secured from thieves at night, had a direct bearing on acceptance of the risk at the premium charged. These are matters shown at the trial and are uncontradicted in the evidence. We believe that the company could not have deviated from the rate without violating the law against discrimination. Article 21.21, sec. 4(7), (8), V.A.T.S. Insurance Code. The fact that the only property stolen was that left out of the safe is evidence of materiality of the warranty or condition, since the breach directly contributed to the loss. The facts are not in dispute, and we find that the promissory warranty and condition were material to the risk as a matter of law. Trinity Universal Insurance Co. v. Winter, Tex.Civ.App., El Paso, 67 S.W.2d 926 (writ dismd.); Automobile Owners' Ins. Assn. v. Hennessy, Tex.Civ.App., Texarkana, 299 S.W. 281 (writ ref.).

We conclude that the trial court erred in rendering judgment for appellees and in not rendering judgment for appellant notwithstanding the verdict of the jury.

The judgment of the district court is reversed and judgment is rendered for appellant.

Reversed and rendered.