EDWARD G. MICHAEL, D/B/A MICHAEL'S GOLD FASHIONS v. ST. PAUL FIRE AND MARINE INSURANCE COMPANY AND McPHAIL, BRAY, MURPHY & ALLEN, INC.

No. 8226SC734

(Filed 15 November 1983)

**Insurance § 141 — retail jeweler's theft policy — failure to place jewelry in safe**

Defendant insurer was liable under its policy insuring plaintiff's retail jewelry store against theft for only 2% of the value of jewelry lost by theft during a break-in at the store where the policy required plaintiff to maintain in the store a Class F safe or vault; plaintiff represented in his application for the policy that 98% of the insured jewelry would be locked in the safe when the store was closed; the policy contained a notice warning plaintiff that failure to comply with his representations in the application could void the policy; the theft occurred while the store was closed; and none of the jewelry was in the safe at the time of the theft.

APPEAL by plaintiff and cross-appeal by defendant Insurance Company from *Lewis, Robert D., Judge.* Judgments entered 26 February 1982 and 1 March 1982 in Superior Court, MECKLEN-BURG County. Heard in the Court of Appeals 13 May 1983.

Plaintiff owns and operates a retail jewelry store. The defendant insurance company issued its policy insuring the plaintiff's business against theft. The defendant McPhail, Bray, Murphy & Allen, an insurance agency, obtained the policy at plaintiff's request. Plaintiff's claim against the defendant insurance company is to recover under the policy for jewelry in the

approximate amount of $19,000 that was stolen when his store was broken into. Plaintiff's claims against the defendant agency are based on allegations that the agency (1) negligently advised him that the theft policy did not require him to keep the insured jewelry in the safe when the store was closed, and (2) failed to obtain a theft policy for his business that contained no restrictions, as it contracted and agreed to do.

The evidence presented at trial tended to show that:

Plaintiff, who had theretofore operated other types of businesses, opened a retail jewelry store on December 10, 1979. Two days later he contacted the defendant agency about getting insurance for his business, and a binder was issued that day which provided temporary fire, general liability and vandalism coverages. But theft insurance was neither applied for nor obtained at that time, as plaintiff was advised, because the alarm system and safe that plaintiff had did not meet insurance industry requirements for jewelry stores. After discussing these requirements and the reason for them, plaintiff ordered a Class F safe recommended by the agent and contacted ADT about their warning system, but he did not have it installed because meanwhile the agency had ascertained that the defendant insurance company might waive that requirement if the Class F safe was obtained. On 7 February 1980, after the Class F safe was delivered, the agency had plaintiff to formally apply to the defendant insurance company for a theft policy, and discussed the different requirements of the application with plaintiff and the fact that the policy and its cost would be based on the information furnished therein. The agency maintains that it impressed on plaintiff the necessity of locking the jewelry in the safe when the store was closed if he was to have theft insurance. The application, called a "proposal" for a Jeweler's Block policy, contained many questions, including several about the safe and warning system. In a section entitled "WARRANTIES AS TO PROPERTY INSURED DURING TERM OF INSURANCE AT ALL TIMES WHEN PREMISES ARE CLOSED" was a question requiring plaintiff to state what percentage of his jewelry would be kept in a locked safe or vault when the premises were closed; plaintiff's answer was 100% and the following handwritten statement was added thereto: "All jewelry will be locked in safe at night."

In response to the proposal, the defendant insurance company issued its Jeweler's Block policy to plaintiff a few weeks later. The policy contained a prominent, brightly-colored *notice* on its face sheet stating "THE ANSWERS TO THE QUESTIONS IN THE PROPOSAL ATTACHED TO THIS POLICY CONSTITUTE WARRANTIES. IF THEY ARE INCORRECT OR ARE NOT FOLLOWED YOUR INSURANCE CAN BE VOIDED." The body of the policy also contained a provision stating:

8. It is a condition of this insurance that:

. . . .

(B) The Insured will maintain during the life of this Policy, insofar as is within his or their control, watchmen and the *protective devices* as described in his or their proposal form or in endorsements attached hereto. (Emphasis added.)

In July of 1980, plaintiff moved his store to a new location and began displaying the jewelry in a manner that made it more inconvenient to put all of it in the safe each night. He notified the agency he was leaving about $2,000 worth of charms in the case each night and asked defendant agency if these changes would affect his insurance. Because of the changes, a new "proposal," in form identical to the first, was done by plaintiff and the agency. In it plaintiff stated that 98% of his jewelry was locked in the safe when the store was closed. This proposal and plaintiff's answers thereto were accepted by the company and added to the policy, as before. According to plaintiff, he asked the agency when the new proposal was submitted how much of the jewelry, if any, he was required to put in the safe at night, and was told that the policy did not require any of it to be locked up, although the insurance company preferred all of it to be; but defendant agency claims it told plaintiff only $2,000 worth of jewelry could be left out when the store was closed.

About three months later, plaintiff closed his store one night without putting any of the jewelry in his safe, because it was late and he was tired, and a thief broke in and stole articles worth about $19,000. The defendant insurer denied plaintiff's claim because of his failure to lock the jewelry in the safe, and plaintiff sued both defendants. At the close of plaintiff's evidence, the trial

court granted defendant insurer's motion for directed verdict with respect to 98% of the stolen jewelry, and granted plaintiff's motion for directed verdict with respect to 2% of the stolen jewelry and the property damage. The judge denied defendant agency's motion for directed verdict, but after considering the evidence, the jury found that plaintiff had not been damaged by the neglect of the defendant agency. Both plaintiff and defendant insurance company appealed.

*Tucker, Hicks, Sentelle, Moon and Hodge, by John E. Hodge, Jr., for plaintiff appellant/appellee.*

*Young, Moore, Henderson & Alvis, by Dan J. McLamb and Barbara B. Weyher, for defendant appellant/appellee St. Paul Fire and Marine Insurance Company.*

*Golding, Crews, Meekins, Gordon & Gray, by John G. Golding, for defendant appellee McPhail, Bray, Murphy & Allen, Inc.*

PHILLIPS, Judge.

Plaintiff and defendant insurance company both challenge the directed verdict by which the company was required to pay for the property damage and 2% of the jewelry lost in the theft—the plaintiff claiming by his appeal that all the stolen jewelry should be paid for, the defendant by its that none of it should be. In our opinion, the trial court's ruling was correct.

An insurance policy, of course, is but a special kind of contract, and in suing on the policy involved the plaintiff is bound by its terms no less than the insurance company. One term of the policy required plaintiff to maintain in the store during the policy period a Class F safe or vault, and another required him to lock 98% of the insured jewelry in the safe when the store was closed. Plaintiff's deliberate failure, for no excusable reason, to lock any jewelry at all in the safe the night of the theft was a breach of his contract obligation and bars his right to recover for the 98% of the jewelry that he promised would be safeguarded against thievery.

Though plaintiff's statement in applying for the insurance that he would lock the jewelry—all of it at first, 98% of it

later—in the safe when the store was closed was dubbed a warranty by the policy, it was not a warranty, as plaintiff correctly points out. This is because G.S. 58-30 provides that statements in applications for insurance or in the policy itself "shall be deemed representations and not warranties, and a representation, unless material or fraudulent, will not prevent a recovery on the policy." But this does not eliminate plaintiff's problems in the case as he contends, since the materiality of his promise or representation under the circumstances that existed is obvious, and his inexcusable failure to comply with it diminishes his rights under the contract accordingly.

A representation in an application for insurance that influences the insurance company to accept the risk and enter into the contract is a material representation. *Carroll v. Carolina Casualty Insurance Co.*, 227 N.C. 456, 42 S.E. 2d 607 (1947). Whether such representations are material depends upon the circumstances in each case and is usually, though not always, a question of fact for the jury. But in this instance we are of the opinion that the materiality of plaintiff's promise to lock the jewelry in the safe when the store was closed is too plain for debate. It is universally known that a fortune in jewelry can be carried in one's pocket, and loose jewelry protected only by a glass window or door and a glass showcase is a prime target for thieves, who can fill their pockets and be on their way long before the police or anybody else can respond to a burglar alarm; but opening and rifling a locked safe is neither that easy nor quick. Had the safe and its use been a matter of no consequence, it is inconceivable that the company would have required or plaintiff would have bought an expensive safe, which has no protective utility at all when empty and unlocked. Against this factual backdrop, in applying for theft insurance on his jewelry, plaintiff stated that the jewelry would be locked in a safe approved by the company when the store was closed; and in response thereto he received a policy stating in language that could neither be missed nor misunderstood that a failure to comply with his representation could void his coverage. In a different setting, a similar statement might well be regarded as immaterial and of no effect; but under the circumstances here, plaintiff chose not to abide by it at his peril, rather than the company's. *See* 7 *Couch on Insurance* § 35:100 *et seq.* (2d ed. 1961).

We are unaware of any previous North Carolina decision involving a Jeweler's Block policy and the failure of the insured to comply with the security and protective representations made in obtaining it. Such cases have been decided elsewhere, however, and our decision is in accord with them. *See Great American Insurance Co. v. Lang*, 416 S.W. 2d 541 (Tex. Civ. App. 1967); *Phoenix Insurance Co. v. Ross Jewelers, Inc.*, 362 F. 2d 985 (5th Cir. 1966). But, more importantly, we think, our decision is in accord not only with the parties' written contract, but with their demonstrated understanding of it, as well. The company would not insure plaintiff's jewelry against theft until plaintiff obtained a suitable safe and represented that the jewelry would be locked in it when the store was closed. Though plaintiff now contends that he did not understand the policy to require him to use the safe, his earlier actions indicate otherwise. He was unable to obtain theft insurance for his jewelry at first, and in order to obtain it, he bought the Class F safe required by the insurance company, at some expense certainly, and promised to use it when the store was closed; and, thereafter, when it became troublesome to lock up all of the jewelry each night, he took steps which led to the policy being amended to acccmmodate that change. These actions indicate as much as the words put in the contract that safeguarding the insured jewelry when the store was closed was material to the contract and was so understood by both parties.

But plaintiff's promise to lock 98% of the jewelry in the safe was not material to the policy coverages for property damage and the other 2% of the jewelry. Thus, the directed verdict in plaintiff's favor as to those losses, but no more, was proper.

As to his negligence claim against defendant McPhail, Bray, plaintiff contends the trial court made several prejudicial errors in charging the jury. We disagree. Our reading of the charge as a whole leaves us with the impression that the trial court carefully and correctly instructed the jury on all elements of the claim, and that a discussion of the several instructions complained of would not be beneficial. Among other things, the jury was specifically instructed that the defendant broker had a legal duty to explain plaintiff's policy to him, "including those conditions the violations of which would result in the policy being voided," and to not misstate the conditions or coverage of the policy. But even if some parts of the charge had been technically incorrect, it is

unlikely that plaintiff would have been prejudiced thereby. This is because the dispute between plaintiff and McPhail, Bray was almost entirely factual. That defendant broker had a legal duty to correctly advise plaintiff insurance purchaser about the coverages obtained really was not contested; what was contested and what the outcome of the case depended upon was the advice that the broker gave. Plaintiff testified that the broker told him that locking the jewelry in the safe at night was not necessary, just preferred; defendant broker's testimony was directly to the contrary. In arriving at their verdict the jury did not accept plaintiff's version of that crucial occurrence and we have no reason to believe they would have done so if the judge had instructed them in the form and manner the plaintiff preferred or requested.

No error.

Judges HILL and JOHNSON concur.