## TEXAS & N. O. R. CO. v. STRATTON et al.

### No. 9377.

Court of Civil Appeals of Texas. San Antonio.

June 20, 1934.

Rehearing Overruled Oct. 3, 1934.

Baker, Botts, Andrews & Wharton, of Houston, Bruce Teagarden, of San Antonio, D. E. Hume, of Eagle Pass, and Boggess, La Crosse & Lowrey, of Del Rio, for appellant.

Jones & Jones and Robt. M. Lyles, all of Del Rio, for appellees.

SMITH, Justice.

This is a companion case to No. 9399, Texas & N. O. Railway v. A. A. Berry et al., this day decided 74 S.W.(2d) 750, and No. 9383, Texas & N. O. Railway v. Clarence H. Stratton, decided on June 13, 1934, 74 S.W.(2d) 741.

Each action was for damages occasioned by the alleged wrongful death of an occupant of a certain Ford automobile in a collision with one of appellant's trains on the early morning of January 15, 1933.

Three young men, and a young lady, were riding in the motorcar at the time of the accident. Joe Stratton and Joe Balsch sat in the front seat; the former driving. Harold Berry sat in the rear seat with Carrie D. Stratton, sister of the driver. The occupants of the front seat were instantly killed; the other two lived only a few days. These suits have been prosecuted by the surviving parents and brothers and sisters of the decedents.

The accident occurred at the intersection of a paved state highway and one of appellant's spur tracks, two miles out of Eagle Pass, when the motorcar ran head-on into the middle of a 380-foot train which was moving slowly across the highway at a probable rate of 3 or 4 miles per hour.

The train was executing a switching movement. An engine with six cars was detached from a made-up train on the main tracks, a few hundred feet away, and was backed out on the spur track, past the crossing, to pick up two cars stationed a short distance beyond the crossing. The coupling was made, the air connected, and the engine was pulling the eight cars back towards the main track. The engine, moving forward, had pulled the string of cars half way across the highway, when the motorcar, moving over the highway at a rate of speed variously estimated at from 17 to 65 miles per hour, collided with the fourth car of the moving train.

The four young people, residents of Bracketville, 40 miles from Eagle Pass, were returning to their homes, after an evening spent in Eagle Pass and Piedras Negras.

The accident occurred at 1 o'clock, Sunday morning. The weather was very cold.

A nearly full moon (which had risen at 9:02 o'clock that night) was overhead. Some of the

witnesses testified the night was fairly clear, with a few light clouds passing slowly by; that there was no fog or other elements to darken the moonlit night. Some testified there was a light fog.

But appellees recovered in the three cases upon the theory, supported by a great preponderance of the evidence, that the night was utterly dark from fog, which rolled over the vicinity in heavy clouds, obscuring all objects, including lights; that motor traffic along the highway in that vicinity was fraught with so many dangers as to render it extremely hazardous to travelers in automobiles. The situation is graphically portrayed in appellees' brief in the instant case as follows: "That the color of the pavement impaired visibility. That numerous structures, brush and the contour of the ground obstruct the view of the track to the East and the headlights of a locomotive would not be visible after it had passed East of the crossing. That the contour of the highway was such that the lights of an auto traveling on the highway from the South would not shine upon objects on the crossing until very nearly to it. That during the winter months the atmosphere in that vicinity was usually enveloped in a heavy fog. That fog obscured the vision, dimmed the lights and made the road slick. Retarded the braking power of an automobile, and the driver could not control the direction of an auto when the brakes were applied under such conditions. That the traffic at the season was heavy. That on the occasion of the collision the fog was so dense the driver of an automobile could not see more than from 30 to 60 feet. That the lights of an automobile would not shine on box cars on the crossing more than thirty feet away. That even the powerful headlight of a locomotive showed but dimly through the fog. That a blazing automobile could not be discerned through the fog until almost upon it. That a bridge in the vicinity could not be discovered by the driver of a lighted auto until he was upon it."

The approach to the crossing was over a straight, even and practically level highway for a distance of at least 900 feet. All the evidence in the case, from both interested and disinterested sources, shows conclusively that when the motorcar entered into that 900-foot zone the train was already upon the crossing. According to their testimony, two brakemen, riding on top of the train with their lighted lanterns in hand, saw the car as far away, possibly, as 1,400 feet, but by that time the train was entering upon the crossing, and the car, approaching at the rate of 60 or 65 miles per hour, according to the brakemen, began to slow down when within 70 feet of the crossing, but crashed into the fourth car from the engine. This testimony is corroborated by conclusive evidence that the motorcar skidded on locked brakes for about 60 feet before striking the train. Further corroboration appears in the incident of a motortruck, approaching from the opposite direction, and crossing in front of the train just before the latter reached the crossing. The driver first slowed his truck down, as if to let the train pass ahead of him; then, apparently changing his mind, speeded up and crossed immediately in front of the train, meeting the ill-fated Ford about 40 feet beyond the crossing, according to his testimony. He further testified that the Ford was slowed down to about 17 miles per hour, for him to pass, and then speeded up, and on into the train.

As it neared the train the Ford swerved over to the left, striking the moving freight car just off the paved section of the highway. As a result of the impact, the Ford was impaled upon metal parts of the freight car door, was dragged along with the train for 30 feet, its gas tank in the front end was ripped open, the escaping gas was ignited, the Ford and its occupants were enveloped in flames. The passengers were badly burned, and the Ford, a crumpled mass from the impact, was burned to a skeleton. Parts of the front of the Ford, including a part of the hood, the torn gas tank, and one of the doors, were so firmly impaled upon the freight car that they could not be removed, the next day, except by the use of a crowbar.

Liability of appellant in this case was predicated upon pleadings and jury findings that the collision was proximately caused by the negligent failure of the railroad company (1) to have the familiar statutory railroad crossing sign in place near the crossing, to give notice to travelers on the highway of the proximity of the crossing, and to warn them to look out for cars; (2) to have a person stationed on the top of the train, near the rear end thereof, with a light to warn the traveling public that the train was about to use the crossing; (3) to have a person stationed near the crossing with a light to warn travelers upon the highway of the presence of the train upon the crossing; (4) to keep and maintain a light in the immediate vicinity of the crossing; the jury also found (5) that the crossing was a more than ordinarily dangerous crossing in the nighttime, and so known to appellant; and (6) discovered peril.

748

■ It is perfectly obvious, as a matter of law deducible from all the evidence, that the absence of the usual crossing sign, or of a flagman with a light stationed at the crossing, or upon the top of the train at the rear end of it, or of a stationary light near the crossing, was not the proximate cause of the accident, whether the situation was enveloped in impenetrable darkness, as contended by appellees and approved by the jury, or flooded with the light of a nearly full moon, as testified to by some of the witnesses. In the first case, the familiar wooden crossing sign, situated off to one side of the highway right of way, surely could not have been seen by a fast approaching traveler peering through the small semicircle made by a windshield wiper, if the fog was so dense that he could not see more than 30 to 60 feet ahead of him, or discern a 12-foot high box car moving directly across his path, or discover a bridge in his path until he was upon it. Surely, the traveler would not have been timely warned by flagmen with hand lanterns, or by stationary crossing lights, if the fog was so dense that the lights of his automobile would not shine on box cars 30 feet away, or if the admittedly "powerful headlight of the locomotive showed but dimly," and even the "blazing automobile could not be seen through the fog until almost upon it." Under these conditions, so described by appellees in their brief, the proximate cause of the accident could not have been the absence of utterly futile warning signs and flagmen, but was, rather, the act of the travelers in rushing along a slippery paved highway at a high rate of speed while "blindfolded" by the fog, with their car windows and windshield closed against the cold and covered with mist.

■ As a basis for the findings that the railroad company should have maintained a statutory crossing sign, a flagman at the crossing and one upon the rear end of the train, and stationary lights at the crossing, the jury found that this particular crossing was "more than ordinarily dangerous as a nighttime crossing," as pleaded by appellees. None of those findings was supported by the evidence.

The crossing was an open one. The wide highway approached it in a perfectly straight course and upon an even and practically level surface. The railway occupied it by a spur track, lying flush with the highway. This track was seldom used by trains; the undisputed evidence being that an average of only one train movement each way per day was made over it. A few houses were scattered along the highway on each side of the cross-

ing; the surrounding country was level and open except for the usual mesquite trees, bare of foliage at this season. It was a typical neighborhood spur crossing, and no more hazardous to the traveler upon the highway than thousands of other similar crossings in the state. In order to meet appellees' and the jury's exactions in this case, it would have been necessary that the railroad company maintain at this crossing the statutory crossing sign, a flagman, and a stationary light, besides a flagman patroling the rear end of the moving train. Either one, or all but one, of these requirements would not be sufficient, for under the jury's findings the absence of either one rendered the company guilty of negligence proximately causing the collision.

Of course the crossing was dangerous at that particular moment under the fact theory upon which appellees recovered. Any crossing anywhere would have been hazardous in such situation, when all travelers were practically "blindfolded" by the dense fog which obscured every object from human view. Not only was the crossing dangerous, but every foot of the highway was likewise and for like reasons hazardous in the extreme to the traveler by whatever means—the hazards of colliding with other travelers, with culverts, live stock; the dangers of dips, curves, slippery paving, and all the other lurking dangers of modern travel.

■ There can be no escape from the conclusion stated by Justice Murray in the companion case, No. 9383, that in this situation the operatives of appellant's train could properly assume that persons traveling upon the highway would exercise the care incumbent upon them in the hazards of the night to keep their car under control so as to be able to avoid colliding with objects disclosed by their headlights.

■ The duty of the railroad company's train operatives in this situation was to exercise due care in approaching and crossing the highway to avoid colliding with persons passing thereon. On the other hand, persons using the highway were under the reciprocal duty of using due care in approaching and crossing the railroad tracks to avoid colliding with trains passing thereon. It is perfectly obvious that those in the automobile failed to use such care, and this failure, whether negligent or not does not matter, was the proximate cause of the accident, as a matter of law.

■ The jury findings against appellant upon the question of discovered peril have no support in the evidence. On the contrary,

those findings are in direct conflict with the undisputed testimony and indisputable physical facts and circumstances of the case. None of the trainmen saw the approaching car until their train was out upon the crossing, when the two brakemen, on top and near the rear of the train, observed it. They had no control over the movement of the train, except that by crawling along the cars and down to the couplings between them they could "cut" the air and bring the train to a stop, which they did as quickly as they could, but not until some minutes after the collision had occurred. They never could have done more than stop the train, and the stopping of the train could not have averted the collision, of course. The enginemen, who controlled the movement of the train, knew nothing of the approach or proximity or peril of the travelers until after the collision had occurred. All the evidence showed conclusively that when the Ford was discovered, or could have been seen approaching, no human power could have averted the collision, unless, indeed, the travelers themselves had slowed down, or turned off the unfenced highway earlier. The trainmen could in no case do more than move the train forward, or bring it to a stop, and then move it backward. According to all possible calculations they had less than 30 seconds in which to act after the powerless brakemen discovered the approach of the ill-fated car, and in that period, given the power, they could not even bring the train to a stop, and that act could have served no purpose. Discovered peril is not in the case, and should not have been submitted as the basis of the futile finding thereon.

It may be worthy of notice that while in this case the jury found that appellant's employees discovered the peril of the unfortunate travelers in time to avoid the accident by the use of the means at hand, but failed to do so, thus proximately causing the accident, the jury in the companion case, No. 9383, found upon the same evidence, that the employees discovered the peril of the travelers' situation in time to avert the collision by the use of the means at hand, and did exercise proper care to use such means. The jury apparently did not realize the significance of the last finding, however, as they thereupon found that the failure of appellant to use the means at hand was the proximate cause of the accident.

And although in this case the jury found that the trainmen rang the bell and sounded the whistle as required by statute, in the com-

panion case, under the same evidence, the jury found precisely to the contrary.

In consonance with the decision in said cause No. 9383, and because there was no evidence to support the theory of discovered peril, the judgment will be reversed, and as the case seems fully developed in all its aspects, judgment will be here rendered that appellees take nothing by their suit against appellant and pay all costs.

### On Motion for Rehearing.

In their motion for rehearing appellees vigorously attack some of the details of the statement of the case in the original opinion.

It is first insisted that we misstated the rate of speed at which the train was moving when struck by the Ford car. It was stated that that speed was probably 3 or 4 miles per hour. There was evidence, however, which perhaps would have warranted a finding of from 3 to 15 miles per hour. This variance is not material.

So was it stated in the original opinion that the truck driver passing immediately in front of appellant's train testified that he met the Ford about 40 feet beyond the crossing. That statement was correct, although other witnesses for appellees gave various and conflicting estimates of that distance. That point is likewise immaterial to the decision.

It is contended that the statement in the original opinion, that the train brakemen carried lighted lanterns, was erroneous. Such was the uncontroverted testimony, as we view the record, but even that point is immaterial, as the brakemen were on the rear car, about 175 feet from the crossing, at the moment of the impact, and were still further away prior to that moment, and it is impossible that their acts or omissions could have influenced the occupants of the Ford.

Appellees complain that their case was unfairly stated in the original opinion, but a careful review of the facts do not support that complaint. That statement seems quite as favorable to appellees as the latter's own statement in their brief, in which they summarize the salient facts of the case as follows:

"He (an expert witness for appellees) testified that the first place where a person approaching said crossing along said highway from the South would have an unobstructed view of the track East of the crossing would be about 75 or 100 feet from the track. That an automobile traveling 35 miles per hour would travel 51 feet per second. (The eye

witnesses estimated the speed of the car in which deceased was riding at 35 miles per hour.) * * *

"That an automobile running at that rate would run from the first point on the highway where it would be possible to see a train to the crossing in one and two tenths seconds. That it would run from the first point where the view would be unobstructed to the crossing in about one and three fourths seconds. * * *

"S. H. Bruce, who arrived so soon after the collision that the auto was still a mass of flames, testified: It was foggy; it was foggy enough I had to run my wind shield wiper; you couldn't see very far ahead, about fifty or sixty feet; I had good lights and could not see over that; * * *

"Gregoria Rodriquez, an eye witness: It looked like there was clouds of smoke; foggy, coming like clouds, like smoke. Although the lights of the automobile were bright they could not see the road very well due to atmospheric condition. After showing that his view of the locomotive headlight was unobstructed and about a block away when it crossed the highway he testified: As the train crossed I could not see the headlights very well; I could see it very dim. * * *

"It was uncontradicted that the locomotive had passed East of the highway and its lights were focussed Eastward away from the highway and was obscured from the view of the persons approaching the crossing along the highway from the South. * * * It was shown that at a point a short distance South of the crossing, estimated by the witnesses at from 30 feet less than a block or half a block, the auto in which deceased was riding, met a lighted truck. * * * That under those conditions the range of one's vision is limited to the place where the lighted automobile in front of him is and after passing the lights one travels from 50 to 75 feet before they can see anything. * * * That the auto was in about 30 feet of the train before its lights reflected on the cars through the fog. * * * That the brakes of the auto were in good condition. * * * That fog made the road slicker than rain and diminished the braking power of an automobile on a hard surfaced road as was the highway in question and that under those conditions an auto operated at 35 miles per hour could not be stopped under 150 feet. * * *

"It was shown that the brakes on the automobile were applied at a distance from the crossing estimated by the witnesses at from 40 to 60 feet and the auto skidded into the train. * * * Defendant's brakeman, N. L.

Craig, testified: I first noticed the automobile a quarter of a mile away from the train. * * * It was headed directly toward the train and the train was directly in the path of the automobile. * * * I realized that unless something was done there would certainly be a collision. * * * At the rate of speed they were going, I figured they could not hardly stop. When it slowed I realized that a collision was about to happen. * * No I did not make any effort to do anything. * * * It is true that this witness also testified that there was nothing he could do. W. G. Seamonds, another one of the Defendant's brakemen in charge of the train testified: The automobile was 70 or 80 feet from the train when I first saw it; 'I didn't do nothing. * * * I realized that there was nothing to be done to keep him from hitting it; I never tried to do anything because there was only a few seconds for anything that could have been done.'

"The automobile in which deceased was riding skidded, with the emergency brake pulled entirely back, into the sixth car from the engine, counting the water car."

No case has come to this court which appeals more strongly than this to the human sympathies. The accident was a frightful one; the consequences deplorable in the extreme. But these considerations, however appealing, can be given no effect upon the question of liability.

Appellees' motion for rehearing is overruled.