**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, Appellant,**

v.

**Roy BERNHARDT et al., Appellees.**

**No. 11509.**

Court of Civil Appeals of Texas

Austin.

June 28, 1967.

Rehearing Denied Sept. 13, 1967.

---

Graves, Dougherty, Gee, Hearon, Moody & Garwood, Dan Moody, Jr., John E. Clark, Austin, for appellant.

Barkley, Cutcher & Alderson, James L. Cutcher, Taylor, for appellees.

O'QUINN, Justice.

The Bernhardts, father and son, brought this lawsuit for damages resulting from a nighttime railroad crossing accident when the son, then a minor 19 years old, while driving his automobile home alone, collided with the side of a freight train stopped across a farm-to-market road.

Plaintiffs pleaded in their original petition, that defendant, Missouri-Kansas-Texas Railroad Company, was negligent by parking the train so as to block the road, by failing to station a flagman at the crossing, and by failing to place a warning light and a mechanical signal bell at the crossing. The railroad company answered and excepted to plaintiffs' pleas of negligence. The trial court sustained the exceptions. Plaintiffs amended and pleaded that the crossing was extrahazardous and that the railroad was negligent in failing to take extraordinary measures to warn young Bernhardt of the presence of the train on the crossing.

Defendant railroad. company again excepted to plaintiffs' pleadings, contending that the pleadings failed to raise the question of extrahazardous crossing, and did not raise the question of notice of the condition to the railroad company. Defendant also excepted to the allegations of negligence for failure to state even a prima facie case unless the crossing was extrahazardous.

The trial court overruled the railroad's exceptions, but in the order overruling the pleas the court expressly found "that plaintiffs' right of recovery, if any, against defendant is dependent upon whether the crossing in question was extrahazardous on the occasion in question." The cause went to trial, in May, 1966, on this basis, to which plaintiffs did not except.

The case was tried before a jury, upon whose verdict on special issues the trial court entered judgment for plaintiffs. Defendant timely moved for judgment notwithstanding the verdict and, after judgment, for new trial, which motions the trial court overruled.

The railroad company has appealed, assigning twenty-five points of error.

The principal question to be decided is whether the finding of the jury, in answer to special issue No. 1, that the crossing was extrahazardous, is supported by the evidence.

The collision from which this lawsuit derives occurred shortly before midnight on November 14, 1961, at a crossing on FM 1331 near Circleville, about four miles north of Taylor, in Williamson County. The road runs generally east and west and crosses the railroad tracks at a sixty-degree angle about 1250 feet east of the intersection of FM 1331 with Highway 95. Young Bernhardt, a student at Temple Junior College, but living at home and working part-time in Taylor, was on his way home from Taylor, where he had been studying with his girl friend, when the accident happened.

The Bernhardts lived on FM 1331 a few miles east of the crossing. The route followed by young Bernhardt was north on Highway 95 from Taylor about four miles to the intersection with FM 1331, thence turning east toward home on FM 1331. He collided with the freight train sitting on

the tracks across the road about 1250 feet east from Highway 95. At the trial young Bernhardt testified he had no memory of events after turning off Highway 95. The evidence is undisputed that his automobile collided with the side of a gondola car and that skid marks measuring about sixty-six feet led up to the rear tires of his automobile.

The crossing is a rural, unlighted crossing, equipped with standard railroad cross-arm signs on each side of the crossing and on the right for roadway traffic approaching the crossing. The customary signs were in place on the roadway giving warning of a railroad crossing ahead. Bernhardt used the crossing every day going to and from home and was familiar with it.

It is undisputed that the night was dark and that there had been some rain. The same weather conditions at the crossing prevailed generally throughout the area and had been about the same at least an hour or more prior to the accident. The witnesses were not in agreement as to how hard it was raining, whether the night was foggy, and how much the rain and fog might limit a driver's vision.

Appellant's train was stalled across FM 1331 because of a pulled drawbar, or coupling, followed by automatic set of air brakes on the entire train consisting of about 150 cars. The engine of the freight train, which was southbound toward Taylor, slipped and pulled a drawbar on the sixth car behind the engine. It was possible to move the engine and the six cars attached to it, after releasing the brakes, but the balance of the train, detached from the small section and engine, could not be moved forward or backward without first removing the damaged car to allow the engine portion to reestablish normal connections through the air brake system. This could be done only by hauling the damaged car into Taylor, where it could be set out, and returning the engine and five attached cars to the stalled portion of the train.

This procedure took nearly an hour. Meanwhile the cars blocking the crossing could not be moved. The stalled section remained across the roadway, with the caboose about eleven cars, or 450 to 500 feet, north of the crossing and the balance of the stalled portion stretching nearly a mile toward Taylor on the south side of the crossing. The engine with five cars had returned from Taylor and renewed connection with the stalled section when the collision occurred. The train had not been moved after recoupling because there had not been sufficient time to build up the air pressure necessary to release the brakes and allow the train to move.

Two members of the train crew, including T. W. Wallace, the conductor, were in the caboose at the time of the collision. All others of the crew were at the head end of the train, about a mile toward Taylor. Wallace testified that in the period the crossing was blocked, and before Bernhardt collided with the train, he saw three other cars approach the crossing from the same side Bernhardt approached. These cars stopped and turned back along FM 1331. The conductor saw Bernhardt's car when it turned off Highway 95 onto FM 1331 and watched it driven eastward toward the crossing. As Bernhardt was closer to the crossing, Wallace observed from the car's speed that it was not going to stop. Owing to a slight curve in the tracks, Bernhardt's car went out of the conductor's vision before actually striking the train, but Wallace heard the impact.

When the collision occurred, Wallace immediately called the engineer by radio and told him to "lap his brake valve and not move." This put the train back in emergency with brakes set. Wallace called the town of Granger and requested police, an ambulance, a doctor and a wrecker. Wallace and the other crew member in the caboose then went to the crossing, where they lifted Bernhardt out of his car and extinguished a fire that had started in the carburetor. Wallace remained on the scene until he was told by the highway patrolman

who arrived to investigate the accident that the train could be moved.

Wallace testified that while he waited in the caboose for the engine to return from Taylor the night was "kind of misty." When asked about the condition of the weather later he described it as "misty rain" but "no fog." The engineer also testified there was no fog. The highway patrolman, Travis Thomas, testified that generally the weather was a mixture of rain and fog the night of the accident, with the fog "patchy" and the "rain itself not too heavy." He described visibility as poor, with enough moisture that he used windshield wipers driving from Taylor to the scene. Young Bernhardt testified that after he left his girl friend's house and started driving home "it was misting rain" and there were patches of fog.

At the time of the collision Wallace and the crew member with him in the caboose were able to see Bernhardt's car as it turned from Highway 95 onto FM 1331, a distance of 1250 feet from the crossing, and observe the automobile from that point until just before it struck the train. A little bend in the tracks obscured the actual impact from them. The caboose was about eleven cars from the crossing, a distance of 450 to 500 feet.

Appellees, the Bernhardts, pleaded that the crossing was extrahazardous due to conditions and circumstances under three headings, as follows:

1. FM 1331 is built up as it approaches the crossing in such manner as to resemble a small hill. An automobile approaching the crossing starts uphill immediately before crossing the tracks. The lights of an automobile approaching the crossing at night would not shine high enough for a parked train on the crossing to be seen. The train could not be seen by a driver approaching the crossing at night until the driver had started up the incline or hill. At this time the driver under normal circumstances would not have sufficient time to stop his automobile before colliding with the parked train.

2. On the night of the accident "it was misting rain and foggy."

3. The railroad company had parked a freight train across the crossing. The box cars on the crossing did not have lights on them. There was nothing on the box cars and nothing at the crossing "to apprise, warn or notify the said Roy L. Bernhardt, or any other persons, that such box cars were on said track completely blocking said crossing at said time."

The question as to what constitutes an extrahazardous railroad crossing has been before the courts of this state in numerous cases. We are concerned in this cause primarily with the law of these cases as applied to railroad crossings at night.

The Supreme Court in 1953, in a case involving an accident at night on a crossing over a farm-to-market road, after reviewing ten prior decisions involving crossing accidents, said that

"These cases clearly hold that an extrahazardous crossing may arise (1) from permanent conditions, or (2) from temporary conditions which make the crossing extra-hazardous at the time the injury occurs.

"But in the latter situation the substantial conditions rendering a crossing temporarily extra-hazardous, must be due to some act or omission of the railway employees, because only under those circumstances could the defendant know or fairly be charged with knowledge that the crossing is temporarily extra-hazardous." Karr v. Panhandle & Sante Fe Ry. Co., 153 Tex. 25, 262 S.W.2d 925, 930, col. 1.

The permanent condition appellees pleaded had to do with the slope, or change of level on FM 1331 in approaching the crossing from the west. Specifically, the allegation was that "said Farm-to-Market Road is built up as it approaches said

crossing in such manner as to resemble a small hill." Appellees alleged that an automobile making this approach would start up the hill "immediately prior to crossing" the tracks, and that it was not until the driver reached this point of ascent that his lights would shine on the train across the roadway. At that time, appellees asserted, a driver under normal circumstances would not have enough time to stop before hitting the train.

Young Bernhardt testified that the only conditions that could have prevented him from seeing the train on the night of the collision were "the weather and the slope."

That there were no obstructions at or near the crossing to keep an approaching driver from seeing the train is uncontroverted. It appears that the conditions briefly described as the slope on the roadway and the weather that night constituted the only basis for contending the crossing was extrahazardous at the time.

It was undisputed that at a point on the road west of the crossing there was a "dip" in the road, from which the incline led up to the crossing itself. The dip was between the crossing and a rise on the road west of the crossing. On various exhibits introduced in evidence the dip was referred to as point "C" and the crossing was called point "B." The rise west of the crossing was point "A." Appellees alleged in effect that lights of an automobile approaching the crossing from the west would not shine on a train standing on the crossing until the driver reached point "C" and started up the incline toward the crossing.

The highway patrolman, who did not measure the distance, and had not seen the crossing for about five years at the time of trial, testified that the distance from point "C," the dip, to the crossing was approximately 150 feet. He arrived at this distance by estimating the distance from the top of the rise to the crossing to be about 100 yards (300 feet) and estimating that the dip was about half way between the

rise and the crossing. The patrolman testified that when he arrived to investigate the accident, he saw the train by his headlights as he started up the incline "just past point C," the dip.

Bernhardt, Senior, father of the injured young man, testified that he made measurements on the ground with a steel tape. He found that the distance from the tracks to the point he took to be the low point (the dip, point C) was 264 feet. Young Bernhardt testified he did not measure any distances. He accepted the distances estimated by the highway patrolman. Thomas, the patrolman, characterized the distances he estimated as "just a guess" and added, "They may not be real accurate."

Appellant introduced exhibits showing distances and elevations along the roadway from Highway 95 to the railroad crossing, a distance of some 1250 feet. The exhibits were offered through G. P. Pargen, a registered public surveyor, who made the measurements and prepared the exhibits.

Pargen testified that the distance from the dip, point C, to the crossing was 250 feet. He also testified that from the top of the rise to the crossing the distance was 650 feet, the same distance the patrolman estimated from memory to be 300 feet.

The patrolman estimated that from point C to the crossing the incline rose about three to six feet. Bernhardt, Senior, estimated that the change in elevation was about six feet. Neither of them made any measurements to determine elevation. Measurement by Pargen showed the rise in elevation from point C to the crossing to be 3.7 feet.

The Pargen profiles from Highway 95 to the crossing, along the 1250 feet of FM 1331, disclose an undulating roadway with two low areas and one rise in that distance. The first low point occurs 250 feet east of Highway 95 and 1,000 feet from the crossing. This point is 5.4 feet lower than Highway 95 and 3.3 feet lower than the crossing. The rise is about half way,

being 650 feet from the crossing, and is 3.3 feet higher than the crossing. The second low point is point C, which is 250 feet from the crossing and 3.7 feet lower than the top of the tracks.

The profiles show that point C, referred to as the dip, is actually the middle point of a 200-foot stretch of road that at its west end is about 11 inches higher than the dip, and at its east end is less than 20 inches above the elevation of the dip. From the dip, or point C, to the crossing, a distance of 250 feet, the rise of 3.7 feet to the crossing is gradual, with no sharp changes.

It appears undisputed that at a point approximately 480 feet from the crossing the roadway is at the same elevation as the crossing. From that point to the crossing an automobile approaching the crossing will pass through a hammock 480 feet long, with its lowest elevation at point C, already shown to be 250 feet from the crossing.

Appellant offered in evidence nine photographs, being Defendant's Exhibit 7 through 15, showing the crossing on a dark night. In some of the pictures a freight train is across the roadway and the same railroad car with which young Bernhardt collided is sitting on the crossing. The pictures were taken from inside an automobile of the same make and model driven by Bernhardt on the night of the accident, using the headlights of the automobile as the source of illumination.

The picture marked Exhibit 11 was taken at point C, 250 feet from the crossing, looking in the direction traveled by young Bernhardt the night of the collision. The same railroad car he struck is shown in the picture blocking the roadway at the crossing. The letters and figures, "M–K–T 760," are legible on the railroad car across the roadway. The standard cross-arms on both sides of the tracks are visible in the picture. Another picture, Exhibit 8, was taken at a point 350 feet from the crossing,

showing the crossing blocked by the train in the same manner as in Exhibit 11. In this picture the letters and figures on the railroad car are visible, as well as the standard cross-arms on both sides of the tracks.

The Commission of Appeals in 1927 approved an instruction to a jury, in a case involving a nighttime crossing, in which the jury was charged that "* * * a nighttime crossing would not be more than ordinarily dangerous unless its condition was such that a reasonably prudent person could not, by the exercise or ordinary care, use the same with safety." Missouri, K. & T. Ry. Co. v. Long, Tex.Comm.App., 299 S.W. 854, 855, cols. 1, 2.

In two companion cases decided in 1934 the San Antonio Court of Civil Appeals held that the presence of a train upon the crossing was sufficient warning to the driver, who ran an automobile into the side of a slowly moving train, and did not render the crossing extrahazardous. Texas & N. O. R. Co. v. Stratton et ux., Tex.Civ. App., San Antonio, 74 S.W.2d 741 (writ ref.); Texas & N. O. R. Co. v. Stratton et al., Tex.Civ.App., San Antonio, 74 S.W. 2d 746 (writ ref.). The accident in the Stratton cases occurred at an unlighted rural crossing on a night that was "foggy and the visibility was bad." The driver of the car skidded about 60 feet before striking the side of the train.

In considering the visibility factor as a condition sufficient or not to establish that the crossing was more than an ordinarily hazardous nighttime crossing, Justice Murray, speaking for the court, said:

"It occurs to this court that whether the visibility was good or bad the trainmen had a right to presume that people using the highway would drive at a rate of speed which would permit them to bring their automobile to a full stop if within the reach of their lights it should be discovered that the highway was blocked by a slow moving train." 74 S.W.2d 741, 743, col. 2.

The Stratton cases make no distinction between a slowly moving train and one that is stopped if the train is already occupying the crossing when the collision occurs. The first Stratton case cites a Delaware case for the proposition that presence of the train "lawfully standing across the highway" is sufficient warning. Philadelphia & R. Ry. Co. v. Dillon, 114 A. 62, 65; cited and quoted 74 S.W.2d 741, 743, col. 1.

The Stratton cases have been cited by other Texas courts in cases involving standing trains. Wichita Valley Ry. Co. v. Fite, Tex.Civ.App., Eastland, 78 S.W.2d 714 (no writ); Kypfer v. Texas & P. Ry. Co., Tex.Civ.App., El Paso, 88 S.W.2d 528 (writ dsmd.); Walker v. Texas & N. O. R. Co., Tex.Civ.App., Galveston, 150 S.W.2d 853 (writ dsmd., jmt. cor.); Reid v. Texas & New Orleans R. Co., Tex.Civ.App., Galveston, 254 S.W.2d 164 (writ ref., n. r. e.).

In Texas & N. O. R. Co. v. Compton, 135 Tex. 7, 136 S.W.2d 1113, (1940) the Commission of Appeals had before it a case in which the driver of an automobile drove into the side of a slowly moving freight train at night at an unlighted rural crossing. "The night was dark" the court said, "and foggy and the visibility was poor." The Supreme Court adopted the opinion of the Commission, written by Judge Hickman, holding that the crossing was not extrahazardous. Judge Hickman concluded, "It would be difficult to conceive of a railroad crossing at which the hazards would be more obvious than at this one."

The Supreme Court, in Fort Worth & Denver Railway Company v. Williams, 375 S.W.2d 279 (Tex.1964), recognized that the Stratton cases and the Compton case " * * hold that the presence of a train on a crossing blocking a public highway does not in itself constitute an extrahazardous crossing." 375 S.W.2d 279, 283, col. 2.

In the Williams case, supra, 375 S.W.2d 279, 283, the Supreme Court observed that " * * * the question as to whether a crossing is extrahazardous necessarily depends upon the facts of each case."

It is the settled rule in this state that a train lawfully standing on a crossing at night does not of itself cause the crossing to be more than ordinarily hazardous. If the night is dark and foggy and visibility is bad, these additional conditions will not, even when coupled with the presence of the train, make the crossing an extrahazardous nighttime crossing.

Under the facts of the case before this Court, there remains only to decide whether the crossing was extrahazardous due to some permanent condition. The only permanent condition we can consider is the slope or incline leading up to the crossing from the west.

We have concluded that there is no evidence to support the finding of the jury, in answer to special issue No. 1, that the crossing was more than an ordinarily hazardous nighttime crossing.

It was clearly demonstrated at the trial that the lights of an automobile approaching the crossing from the west will shine directly upon a train standing on the crossing when the automobile is as far away as 250 feet from the tracks. All the witnesses agreed the lights of an automobile will shine on the train at the crossing as soon as the car starts up the last incline toward the crossing. The highway patrolman, who did not measure the distance, admitted that his estimate was only a guess and "may not be real accurate." He estimated the distance to be about 150 feet. Young Bernhardt in his testimony simply agreed with the patrolman's guess.

Bernhardt, Senior, after measuring the distance with a steel tape, testified that the ascent from point C, along the incline toward the crossing, began 264 feet west of the tracks. There was no testimony that from point C to the tracks the lights of an automobile would not shine on a train standing on the crossing.

Young Bernhardt testified that since the accident he had driven the same stretch of roadway leading up to the crossing from the west at night. He found that as he started up the last incline, toward the tracks from point C, his lights would shine on the crossing so he could see something if it were on the crossing.

Defendant's Exhibit No. 8, a picture taken 350 feet from the crossing, shows the lights of an automobile of the same make, year, and model driven by young Bernhardt shining upon the same railroad car the young man drove into the night he was hurt. Clearly there was no obstruction presented by the slope or incline to prevent Bernhardt from seeing the train a distance of 250 to 350 feet before coming to the crossing.

Thomas, the highway patrolman, went directly to the scene of the accident from Taylor, apparently traveling the same course followed by young Bernhardt leading up to the collision. The weather conditions were the same as when the collision occurred. The train occupied the crossing exactly as it had when struck by Bernhardt's automobile. Thomas agreed with the Bernhardts that at point C, the beginning of the incline toward the tracks, the railroad car on the track across the road was visible in his headlights.

In his capacity as an investigating officer, Thomas appears to have been trying, as he approached the scene of the accident, "to determine how difficult it was to see,—if that was part of the accident and it was difficult to see." The testimony of the patrolman touching upon his approach to the crossing and at what point he was able to see the train in his headlights was in part as follows:

"Q Now, then, as I understand it on this night when you were coming out there, and when you were driving up, I suppose you approached the scene of this collision from the same direction that Mr. Bernhardt apparently did, is that correct?

A Yes.

Q And when you were coming up there, as I understood it, you said that you had some trouble seeing the train until your lights, you started up past point C, is that right?

A Yes.

Q Am I correct in understanding that when you got to the bottom of this dip, if we will call it that, and you started up the incline, that then your lights were on the train. Is that what you are telling us?

A That's exactly it.

Q I want to be sure we understand what you are telling us. In other words, referring to your diagram, when your car, if this is the bottom of the dip we will say right here, when your car got to that, started like right there, I'm not very good at drawing cars you see, that's when you are telling us that your lights hit the train, is that right?

A As I remember it, when we started up grade.

Q As you started upgrade, your lights shined on the boxcar?

A Yes, sir. I remember making, in other words, trying to determine how difficult it was to see,—if that was part of the accident and it was difficult to see.

Q Now, then, I want to understand when it was difficult. Are you telling me it was difficult when you were going between point A and C now, is that right?

. . . .

A I said it was difficult, more difficult than it ordinarily would be because of the weather, motionlessness of the train, and the terrain,—a combination of those factors.

Q But then after you got past point C, your lights did shine on—

A My headlights picked it up and I detected what it is. You can see it, sure.

Q Well, I'm trying to find out as best you can tell us when this took place. I take it that it took place about where I've drawn that little purple—

A I'd say there or closer to the point B.

Q Well, when you start up the incline, is that right?

A Yes.

Q All right. Now, then, at that point, you could see the boxcar on the track on the, across the road?

A Uh huh.

Q It was then visibile in your head lights?

A Yes."

Young Bernhardt testified that as he drove toward home the night of the accident he was traveling 45 to 50 miles an hour. The jury found in effect that Bernhardt was driving an automobile equipped with proper lights. Thomas testified that Bernhardt's tires laid down about 66 feet of skid marks before his car struck the train. The patrolman also testified that the normal reaction time for a driver to apply his brakes is one-half to three-quarters of a second. Using notes made of his investigation and employing charts used by the department of public safety, Thomas estimated that an automobile traveling 45 miles an hour, or 66 feet per second, on wet pavement would require "at least 120 to 130 feet" to stop, including reaction time of the driver.

Bernhardt's automobile struck the train with such force that the doors on the car were jammed and Bernhardt was pinned down with the steering wheel on his chest. His legs were pinned to the seat by the driving post. The railroad crewmen who extricated Bernhardt from the wreck had to take "some time to get" the door open, and when they "finally got the door open and bent this steering wheel off of his chest," they then "removed him from the wreckage."

Appellees pleaded the trainmen should have placed lights on the box cars at the crossing and should have taken other steps at the crossing "to apprise, warn or notify the said Roy L. Bernhardt, or any other persons, that such box cars were on said track completely blocking said crossing at said time."

■■ We have decided that the trainmen had a right to assume that Bernhardt would act in a reasonable way to avoid running into the train while it was lawfully standing across the roadway. The railroad crewmen were entitled to assume that a reasonably careful person, driving an automobile on a roadway at night, under adverse weather conditions, will use such lights and travel at such rate of speed that he will be able to stop his automobile within the distance he can plainly see by his headlights a railroad car standing across the roadway motionless on the railroad track and effectually obstructing passage over a straight unobstructed roadway. The trainmen had a right to assume that Bernhardt would drive in this manner, and the railroad did not omit to perform any duty by not showing lights or giving other warning of the presence of the train standing on the crossing. Stratton cases, supra 74 S.W.2d 741, 743, 745; 74 S.W.2d 746, 748.

In the recent case of Missouri-Kansas-Texas Railroad Co. v. Wagner, Tex.Civ. App., Waco, 400 S.W.2d 357 (writ ref., n. r.e.), the court found an unobstructed night-time crossing, with which the driver was familiar, not to be extrahazardous. The driver of the automobile approached the crossing with his lights on dim and struck a slowly moving train. Skid marks extended back a distance of 66 feet from the railroad. The court observed that the driver had seen the train "at some distance, more

than 66 feet from the railroad," since the skid marks measured that distance. "Therefore," the court pointed out, "his lights picked up the train * * * at some point back from the time he applied his brakes." The court cited the Stratton cases, supra. The court held that the driver "was guilty of negligence as a matter of law in running into the caboose." 400 S.W. 2d 357, 361, col. 2.

■ We believe there is no evidence to support the finding of the jury that the crossing on the night young Bernhardt collided with the train standing on the tracks was an extrahazardous crossing. We hold that the crossing at the time as not an extrahazardous crossing as a matter of law. As was observed in Walker v. Texas & N. O. R. Co., supra, 150 S.W.2d 853, 857, col. 2, "The foggy condition rendered the crossing more than ordinarily dangerous * * * in the same way and to the same extent, that it rendered every other part of the highway more than ordinarily dangerous." At least three other drivers were observed to stop and turn back at the crossing while the train was stalled across the roadway and before young Bernhardt drove into the side of the train with such momentum that it thrust the steering wheel onto his chest and caused the driving post to pin his legs to the seat.

■ We conclude that the only condition that rendered the crossing more than ordinarily dangerous as a nighttime crossing on the night Bernhardt collided with the train was the weather, with rain and some fog. Since the danger was caused by the weather, including fog, and applied to all driving on the roadway, railroad crossings included, the railroad had no duty to warn of danger arising from the rain and fog. Walker v. Texas & N. O. R. Co., supra, 150 S.W.2d 853, 857.

This appeal presents a number of questions arising from the record and assigned by appellants as error. The first of these questions we have decided in holding that there was no evidence to support the jury's finding that the crossing at the time of the accident was extrahazardous. Appellant carefully preserved this point at every stage of the proceedings in district court. Among other steps, appellant at the appropriate time moved for judgment notwithstanding the verdict.

Our conclusion on this point makes it unnecessary to discuss other questions. The trial court should have rendered judgment for appellant notwithstanding the verdict, for which reason the judgment must be reversed and judgment be rendered that plaintiffs take nothing.

The judgment of the district court is accordingly reversed and rendered for appellant.

Reversed and rendered.